**UNITED STATES v. DILLIARD et al.**

No. 46.

Circuit Court of Appeals, Second Circuit.

Nov. 21, 1938.

John J. Burns, of New York City (Samuel Becker and Nathan David, of counsel) for Dilliard.

Edmund J. Donegan, of New York City, pro se.

Miller, Owen, Otis & Bailly (Nathan L. Miller, of New York City, Edward J. Bennett, and Nathan Probst, Jr., of counsel), for Koven.

Walter Brower, Special Assistant to the Attorney General, of New York City (Bernard Tompkins, of New York City, and C. Agnes McHugh, and Charles J. Wagner, Sp. Attys., Department of Justice, of counsel), for the United States.

Before L. HAND, SWAN, and AUGUSTUS, N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The defendants appeal from judgments of conviction under an indictment charg-

ing them among other counts with a conspiracy to use the mails to defraud: they complain (1) that the evidence was not sufficient to sustain the verdict; (2) that they were unfairly denied a bill of particulars in advance of the trial; (3) that the judge erred in various ways in his summing up to the jury, and in the admission of evidence; (4) that their cross-examination was improperly curtailed; (5) that the court should have granted a mistrial, and (6) that the prosecution's speeches to the jury were unfair. The first ground requires a statement of the evidence. Dilliard was president of the State Title & Mortgage Co. and its chief executive; Koven was a vice-president, concerned chiefly with the appraisal of real property; Donegan was also a vice-president, in charge of advertisements and publicity, and later of the "default department". A fourth defendant, one Skiffington, was acquitted. The company was organized in the year 1927 for the purpose of selling guaranteed mortgages: sometimes it sold these outright; sometimes it sold "participation certificates" in a single mortgage, which it held in trust for certificate holders; sometimes it set up as security a pool of mortgages, which it either assigned to a trustee, or itself held in trust. On June 1, 1929, it was merged with two other companies doing a similar business, and took over their assets and obligations; its capital was then $8,300,000. It continued in business until March 3d, 1933, when it suspended operation, and it was taken over by the state insurance department in the summer of that year. The chief irregularities relied upon by the prosecution were in the management of the mortgage pools, the appraisals of the real property, and the accumulation of back taxes and interest. With these were coupled false entries in two financial statements issued at the end of 1931 and 1932. The indictment contained, besides the conspiracy count, a number of others, each laying against all the defendants severally, the posting of a letter in pursuance of a scheme to defraud. § 338, Title 18, U.S.Code, 18 U.S.C.A. § 338.

The important series of pool certificates for the purposes of this appeal were called "C", "E", "H" and "K". All these required the mortgages to be first liens upon the property and of an appraised value of one and two-thirds, or one and a half, times the advances against them: the company, in all cases reserved power to withdraw any mortgage and substitute others in its place. On July 24, 1931, the certificates in Series "C" amounting to about $1,500,- 000, were secured by 131 mortgages, assigned to a trustee. (The security for this series was required to be one and two-thirds of the debt). The company wished to sell or pledge these separately, as they were readily disposable and it was in need of funds; and, acting under the power we have just mentioned, it withdrew them all from the trust and substituted a single mortgage upon an annex to the Hotel Victoria in New York City. The face of the substituted mortgage was $1,473,000, which we assume was equal to the certificates outstanding; and the trust deed did not in terms forbid the substitution of a single mortgage for a pool, though some of the pamphlets and leaflets issued by the company had spoken of the added security given to a pool series by the diversity of its security. This Victoria mortgage had originally been a building loan, and had then been refunded into a $1,500,000 mortgage, with an amortization provision for payments at $3,000 a month. It had been reduced by $27,000 through such payments, but three of these were already in default on July 24, 1931, though one was later paid; and there were $19,000 of unpaid taxes upon it, which of course were prior to the mortgage. Moreover, the company had tried unsuccessfully to collect it, and had indeed begun the foreclosure of a junior mortgage which it also owned. When the loan was first made in 1929 Koven had appraised the property for $2,250,000; at the time of the substitution he appraised it at $2,500,000 and the bona fides of this valuation was the subject of sharp controversy at the trial. The prosecution's witnesses went as low as $1,750,000, and on the company's own books the original figure of $2,250,000 continued to appear for the years 1932 and 1933. At some time, not definitely fixed, Koven had learned of an appraisal of Cruikshank & Company, a well known firm, as of July, 1930, for $1,925,000 and he had noted it upon his own appraisal. The prosecution's theory was that he had dishonestly raised his original appraisal of $2,250,000, so as to give the property the necessary equity for a loan of $1,500,000. After the substitution, more than $300,000 of Series "C" certificates were either renewed by holders after they became due, or "reinvested", which meant paid in part, and continued for the balance. Moreover

by the end of March, 1933, about $560,000 of Series "C" certificates had been transferred to Series "E" as part of its collateral.

The company itself was the trustee for Series "E", of which there were more than $2,000,000 outstanding at the end of 1931. Between April 30, and July 31, 1932 the collateral behind this series was as follows: about $100,000 participation certificates in single mortgages; about $540,000 in equities behind separate first mortgages, themselves pledged as collateral for bank loans; $1,500,000 in equities behind mortgages pledged as collateral for a loan of $5,000,000 by the Reconstruction Finance Corporation; about $540,000 in "Carlton Notes", so-called. In July, 1932, on demand of the Insurance Department of New York and the Reconstruction Finance Corporation, the company took out the equities—which were wholly unauthorized—and substituted mortgages which, together with certificates from other series, varied between about $1,200,000 and $1,400,000 until the company stopped business; but the "Carlton Notes" always remained in the pool and without them the collateral never amounted to $1,500,000. These notes were obligations of the Carlton Land Sales Company, secured by purchase money mortgages upon unimproved land in the East Bronx, of whose value there is no evidence on June 30, 1931, when they were substituted in Series "E" for mortgages withdrawn. A letter of Donegan's on June 22, 1932, declared that at that time those of the lots which were left were worth about $455,000, and those sold were worth $321,500. These last had never been released though there were negotiations in progress which resulted in releases for less than that amount. We shall however assume that the total was then about $776,500, from which must be deducted however tax encumbrances of $100,000. This left an equity of $676,500 to which we may add for reasons not necessary to state $34,000, making $710,000 in all. This was enough to secure only $425,000 of the $531,000 outstanding notes and even then only as junior to the tax liens. All this property was, moreover, unimproved as we have said.

Series "H" and "K" were much smaller than "C" and "E": about $500,000 certificates had been issued in "H", and $460,000 in "K". The objection to the security for these was that in many instances the original mortgage pledged had been foreclosed by one or two or three dummy companies which bought in the property at sale and executed new mortgages upon it. Sometimes the old appraisal was used; sometimes Koven would make a new appraisal, the bona fides of which the prosecution challenged; sometimes the property was again appraised shortly after his appraisal at a much lower figure; sometimes the appraisal itself bore a code reference which signified a lower value. These last were explained as appraisals at forced sale, "hammer values", and not as intended to represent the real value; but the jury was justified in reading them otherwise. In some instances the past due interest and costs of foreclosure were added to the mortgage, though it was well known in 1932 that the general trend of realty values was downward. When these properties were remortgaged the dummy executed the bond; it had no assets and the bond was worthless, though the company had at times represented the mortgagor's bond as a substantial part of the security. Series "E" as well as "H" and "K" contained some of these mortgages.

As we have said, the company repeatedly asserted and spread broadcast that all the realty mortgages were first liens. This was not true. Taxes and interest were allowed to fall into arrears in substantial quantity. The mortgage securing Series "C" was, as we have said, already in default when substituted, and further taxes fell in arrears during 1931; and although these were secured by the delivery of a cheque to the trustee in July, 1932, new taxes again accrued which were not so defrayed. On December 31, 1932, there were arrears of taxes and interest of more than one year's standing upon nearly 70% of the mortgages in Series "E"; upon about 29% of those in Series "F"; upon 25% in Series "H" and about upon 20% in Series "K". The defendants argue that the sum of these was very small, compared with the total value of the collateral itself, but that misses the point. Arrears of taxes and interest for so long a period as a year are usually an indication, either that the property is not paying its way, or that the mortgagor has lost interest in it: it is a danger signal, as the company itself emphasized in one of its booklets.

The foregoing is a brief synopsis of those details upon which the prosecution relied as to the management of the mort-

gage pools, and other certificate series. It is unnecessary to consider the charge arising out of the two financial statements prepared by Dilliard or under his direction as of December 31, 1931 and 1932. The supposed fraud as to these lay in increasing the cash item in each. Dilliard raised this item by borrowing money upon the company's note in each year, and adding the proceeds to the cash, and the note to the liabilities: immediately after the close of the year the transaction was reversed and both items were cancelled. The prosecution's position was that in each case the cash was not in fact immediately available to the company, and was therefore not cash; and that, if it had been, it was still a fraud to pad the statement with a transaction which was no part of the company's business in the ordinary conduct of its affairs, but had been interpolated only to cover the small size of the cash on hand. The evidence as to both these transactions was competent against Dilliard upon the substantive counts quite independently of the conspiracy, and did not become less so because he was acquitted on them: its competency against Donegan and Koven depended upon whether the preparation of the statement could be supposed to be in execution of any part of the concert. Arguendo we will assume that when the case was finally closed, the prosecution had failed to prove, not only that they were privy to Dilliard's padding of the statements, but also that that was remote from what they had jointly conceived—the last a rather violent assumption. That makes no difference in the result, because it was not necessary for the prosecution to prove that the conspiracy included all the misrepresentations laid in the indictment: there was a conspiracy to use the mails in a "scheme" to defraud— just as there was a "scheme" to defraud— if the three defendants united to use the mails for any of the fraudulent misrepresentations charged. Nash v. United States, 229 U.S. 373, 380, 33 S.Ct. 780, 57 L.Ed. 1232; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Kaplan v. United States, 2 Cir., 18 F.2d 939, 943; Havener v. United States, 10 Cir., 49 F. 2d 196, 199; Levine v. United States, 9 Cir., 79 F.2d 364, 369, 370, 371. The most that Donegan and Koven could have asked was that the jury should not consider as any part of the conspiracy Dilliard's manipulation of the financial statements: this they did not do.

Donegan joined the company in January of 1931 and in June became a director and treasurer. Soon thereafter at Dilliard's request he took charge of a "selling campaign", which he began by a form letter sent out in great numbers to prospective customers until the end of November, when the directors stopped it because of the expense involved. This letter said that all certificates sold by the company were secured by "a first lien 'upon carefully selected improved properties * * * valued at not less than 150% of the amount of the mortgage". This was repeated in a "reply" post-card, widely distributed during the same period. The company also prepared three pamphlets: the first, issued in 1930, was entitled "A Simple Investment That is Safe". There was some controversy as. to how long it was distributed, but the jury could have found that it continued to be used until the end of 1931 and later. The second was put out in the summer of 1931, and entitled, "Your Home and Its Mortgage": its distribution continued through 1932, and possibly later. Both of these repeated the assurance that the mortgages securing the certificates, were first liens upon property worth 150% of the loans. The first declared that the certificates could be cashed at the end of any three years period—which was untrue, for the company had twelve or eighteen months of grace, if it chose to claim them. It also declared that the mortgages were not only safe, but saleable. The second declared that the mortgages were supervised by a trained department which preserved "the paramount lien of the mortgage". Both were largely filled with general puffing, assuring buyers of the absolute safety of the certificates; that they were "worryproof"; that the mortgages securing them represented the "pick" of those owned (a curious irony); that the security was of "carefully selected widely diversified mortgages"; that the mortgages were "protected by every safety device known"; and more of this sort. A third pamphlet, "Panics and Depressions", appeared in the summer and autumn of 1931, and was continued at least through 1932. It was an analysis of the course of realty values during financial depressions, and expressed the belief that guaranteed mortgages, which had never failed investors in the past, would not fail them in the present; that they were "always more than adequately secured, produced in a limited and

closely watched territory by companies with a single eye to the soundness of real estate values". Folders, blotters and advertisements sent out or published during 1931 or 1932—the disputed duration of their distribution being for the jury's determination—were of the same general character.

From what we have said it is apparent that there was ample evidence for a verdict against the company: it had issued repeated statements absolutely at variance with the facts: in particular, the mortgages were by no means uniformly first liens upon improved property, and in many cases the appraisals of the mortgaged property could have been found to have been deliberately made too high. It is, moreover, impossible to justify the greater part of the collateral behind Series "E", during the second quarter of 1932, and the "Carlton Notes" were always improper: the jury might have found that the appraisal of the Victoria Annex had been made only as a cover to get hold of the existing pool of saleable mortgages, and to put in its place one which it had found unsaleable and knew to be of doubtful security. Again, the practice of executing a new mortgage by a dummy upon foreclosure of the old, was permissible only if a new and disinterested appraisal was made; something prima facie most unlikely at the old figure, for the very fact that the first mortgage had been foreclosed was some indication that the loan as it stood had proved too heavy. This was not true when the foreclosure was of a junior mortgage, but even that did not abate the necessity of a new appraisal. The evidence seems to us to leave little doubt that, as so often happens in similar cases, the company, being more and more pressed financially, continued to repeat what though once true, had become false and was then known to be false. That is enough to constitute a "scheme to defraud" within § 338 of Title 18, U.S.Code, 18 U.S.C.A. § 338. Perhaps it is true, as was held in McLendon v. United States, 6 Cir., 2 F.2d 660, that sporadic deceits in the course of a business will not constitute a "scheme"; that there must be some continuity in the representations, so that they can be said to be part of the continuous means by which the business is carried on. There was no such question here: true or false, the utterances were repeated again and again over a period of at least eighteen months; they were continuous

enough to be a "scheme", and the only question open was whether it was a "scheme to defraud". The language of Pelz v. United States, 2 Cir., 54 F.2d 1001, 1005, merely follows McLenden v. United States, supra. The "scheme" was a fraud if the company knew that what it said was false and meant to "obtain money or property" by means of it. (The defendants suggest that to obtain renewals and reinvestments was not to do so; but they are mistaken. The money was due to the certificate holder and he could have demanded it: if by false utterances he was induced to leave it on deposit, his money was then as much "obtained" as though he then paid it for the first time).

However, although a verdict against the company under § 338 of Title 18, U.S. Code, 18 U.S.C.A. § 338, would have been justified, more was necessary to charge the defendants personally: they had to be conscious promoters of the "scheme" to be guilty. There can be no question that Dilliard could have been so found: he was the executive head of the whole business; and it was not reasonably possible that he should have been ignorant of the way in which the pools were managed: he was acquainted with the collateral behind the "Carlton Notes": he knew that the company's equities were used as collateral for Series "E": he knew of the substitution of the Victoria Annex mortgage in Series "C": he knew in some cases at least— e. g. the "Tom Vincent" mortgage—that the properties were over-appraised. Donegan was in charge of the "selling campaign" which he had declared at one time to be intended to secure a market for "frozen" or "partially frozen" mortgages: he knew the value of the property securing the "Carlton Notes" at least in 1932: he made up the "default cards" on which the code letters appeared signifying the concealed "hammer values": he knew in November, 1931, that equities had made up part of the security of the Series "E" pool, and even though he was honest in then saying, quite untruly in fact, that they had all been taken out, at least he was presuming to tell the examiner, Diefendorf, as absolute knowledge what he did not know. Moreover, on his own admission he made no effort to see that no equities were thereafter made part of the security of this series. His disclaimer of any knowledge of the presence of the "Carlton Notes" in Series "E" was very guarded. He directed that plainly false answers should be

given as to the relations of the company to its affiliate or subsidiary. At least by July 28, 1932, he knew that the Victoria mortgage was in Series "C". Koven actually made the Victoria appraisal and the appraisals of foreclosed properties; and he knew what was to be lent on these appraisals; indeed on the Victoria appraisal itself appeared the legend that it was to be used in Series "C"; and he did not deny that he knew that the mortgage was to go into that series. Obviously, if there was any practice to over-appraise, he was privy to it. He confessed that at some time he had read some or all of the pamphlets, certificates and other printed matter. We have dealt with these details, lest it be assumed that there was none such; but the more convincing inference is to be drawn from the improbability that these three men should not have been acquainted with the conduct of the business in its important features. There was indeed a large board of directors, but they were the chief executives and in daily charge. While each disclaimed responsibility—seeming to intimate that the irregularities might have been the work of a subordinate, named Sherry, on a salary of $3,000—the judge well observed to the jury: "You cannot put a department into a sealed room * * * men who are generally conversant with a business of this kind, ordinarily know some of the things that generally take place".

■ The grant of a bill of particulars concededly rests in the discretion of the trial court, and unless there is plain abuse, we should not interfere. In prosecutions for fraud they are not of as much service as in less diffuse crimes, because the prosecution may in any case put in evidence other instances of similar frauds in order to show intent. United States v. Shurtleff, 2 Cir., 43 F.2d 944, 947; United States v. Sprinkle, 2 Cir., 57 F.2d 968. Moreover, the only particulars by any chance allowable here would have been details of misrepresentations, and the times and places when they were made. Most of the other demands were wholly unwarranted; many went into the details of the prosecution's evidence, and called for its witnesses. As to the details of the representations, they were in the pamphlets, folders, etc., and while it would have been in our judgment better that these should have been specified, the defendants could hardly have suffered any serious prejudice from failing to see them in advance. The prosecution developed its case for 24 days, during which the defendants had ample opportunity to examine the papers: they were not entitled to know in advance what conclusions would be drawn from their books; and if their cross-examination turned out to be inadequate, they could have asked to re-examine the witnesses. They do not even now show us, except in the most vague language, how they were handicapped in preparing their defense.

■ We can find nothing to complain of in the judge's summing up. The chief objection to the colloquial part we have already considered; it was that he did not make general intent to defraud a factor in the crime. The defendants did not ask that they should not be convicted because their statements were sporadic and not interwoven into the business so as to constitute a "scheme". Moreover, even if they had, they would not have been entitled to such an instruction, because, if in fact they were privy to the representations and these were false, there could be no doubt of the existence of a fraudulent "scheme". The representations were repeated again and again, and were the only means by which the business could be conducted. To add to the charge a general statement about intent to defraud would only have confused the jury, who would probably have supposed, not merely that some continuity of representation was necessary, but that an intent to defraud was more than a conscious falsehood used to obtain money. The statute does indeed put these in the alternative, but we think them synonyms: at least in a case like this we can find no difference in their meaning. The other objection is that the judge unduly bore upon the jury and invaded its function. Once or twice he did indicate an opinion, it is true; but without pressing it further than he might. The most important of these in his colloquial remarks were his characterizations of the loans at the end of 1931 and 1932. He said that the first was a loan "in name only", because it was not immediately available; that was undeniably true and unobjectionable. He said the same thing of the loan of 1932, upon which the evidence was certainly equivocal; but this he later retracted by saying that he had only given his opinion; and he was within his powers in that. The head and front of

his offending was what happened after the jury had been out about eight hours, and before it was locked up for the night. One of the jurors asked an incoherent question, apparently designed to learn whether the guilt of each defendant must be separately proved. The judge so understood it and answered in the words which we quoted above, to which he added in general language that the question was "of the knowledge of each of these four men as to what was going on", not the details, but "the general situation and all the facts in the case". The juror, becoming more explicit, then asked whether each was responsible for the others; the judge answered that he had not said so, that crime was personal; and he then repeated in substance what he had just said. Later, on being asked to speak on the subject of motive, he said that it was relevant upon the issue of intent, though in itself not an element of the crime; and finally, being further prodded, he added that the defendants' natural desire to keep the business going was a motive. Obviously, it was. The defendants wished him to say that the pools were so small a part of the business as not to furnish a pressing 'motive; and perhaps having broached the matter—though it was merely a question of fact—it would have been better to mention not only their motive to keep the business going but the insignificance of their motive to falsify. But it was a false lead anyway, for the failure of a pool would have had an importance quite out of proportion to the amount of the outstanding certificates: once one issue of certificates went down, the whole company would probably have fallen with it. We cannot see in all of this anything which unduly prejudiced the defendants. The substance of it was that the jury must find each man guilty of what he personally knew: the additions so far as he expressed his own views were in no sense a drive upon them to obtain a verdict.

▮▮▮▮▮▮ During the course of so long a trial, taking 42 very hotly contested days, there were of course innumerable objections to the admission of evidence; no judge could have ruled unerringly upon each one, and today such errors have much less importance than they once had. We cannot begin to go over these objections in detail; we shall not consider those that were not specifically argued in the briefs. The most important was as to the "victim" witnesses —those who had lost money in the venture. We have already discussed the abuses which this kind of testimony may occasion (United States v. Brown, 2 Cir., 79 F.2d 321) but there was no abuse here: the witnesses were material in a sense not usually the case. The pamphlets, folders and blotters were left upon the tables of the company's office, and it was important to learn how long that sort of distribution continued. They could prove it and they did. Objection was taken to their talks with the salesmen, but nothing more was allowed than what the salesmen said to them to induce them to buy or to leave their money in the company. Enough was shown to connect the defendants with these declarations: they knew that certificates were to be sold or renewed, and that salesmen were employed to sell them, and the witnesses put nothing in the salesmen's mouths which was not fairly within the line of their duties so imposed. The only other objection important enough to mention was the notation of the Cruikshank valuation of June 1930, upon the Victoria appraisal. Delafield, who made the Cruikshank appraisal was not called, and the justification for allowing it in evidence was Koven's notation of it on the paper. The objection rests upon Koven's testimony that he wrote it down after he had made his own appraisal, and that it did not therefore charge him at the relevant time with notice of his variance from Delafield. In the first place the jury was not bound to accept his word as to the sequence of events: the document was confessedly of his own making and so was the notation, which he had already perjured himself in denying before a legislative commission. That in itself was evidence of guilt, and there was perhaps a little less likelihood that he should have added the notation later than at the time. Aside from that, whenever he made it, the notation showed that he took the appraisal seriously, and it was competent at least to show that in spite of it he did not retract what he had done.

▮▮▮▮▮▮ The supposed limitations of the defense's right of cross-examination were the following. Sweeney was an investigator for the prosecution who had been over the company's books and had testified to their contents at great length, and with the aid of many compilations, schedules and the like. He was then cross-examined for parts of six days—his examination occu-

pies about 160 pages of the record—at the conclusion of which the prosecution questioned him on redirect for a short time. The judge then announced that there would be no re-cross-examination. It is to be regretted that he did so without inquiry as to why any redirect was desired; but if the defense really wished to go further, it did not say what it wanted, and it does not now say what it lost. The next complaint is that when the prosecution was cross-examining Dilliard he was questioned—for purposes of impeachment—about a letter which was not shown him. This was indeed contrary to the doctrine of The Queen's Case, 2 Brod. & Bing. 284, 286, which was countenanced, though scarcely accepted as peremptory, in The Charles Morgan, 115 U.S. 69, 77, 78, 5 S.Ct. 1172, 29 L.Ed. 316. Professor Wigmore has to say of the rule, § 1259, that "for unsoundness of principle, impropriety of policy and practical inconvenience in trial" it "committed the most notable mistake that can be found among the rulings on the present subject". It was reversed by legislation in England, and is everywhere more honored in the breach than in the observance. Fairness usually does require that the witness shall be told when and where he made the putatively contradictory statement; but that is really all that the Supreme Court has ever exacted, and we think more is not necessary. Finally, it is insisted that the judge refused to allow the defense to examine Sweeney's work-sheets and a report of the results of his investigation to his superiors in the Department of Justice. The two rulings stand on quite a different basis; the work-sheets were the originals from which the reports were compiled that went into evidence and from which he testified. They should have been freely open to the defense and they were: the judge said that Sweeney should (literally "can") produce them, and Sweeney said that he had "them all available". It does not appear to what, if any, extent, his tender was then accepted, but in any event when the matter was again raised at the close of the prosecution's case, the time had passed for the demand. As to the report, there is not the slightest showing that it was competent as evidence; it could only be so in case it contradicted Sweeney's testimony which was not likely. The defendants seem to suppose that they had the privilege of roaming about at will among any memoranda made by the prosecution in preparation for trial: that indeed is not an uncommon illusion, but it has nothing whatever to support it. We have recently dealt with the point in United States v. Muraskin, 2 Cir., 99 F.2d 815.

During the trial a woman juror came to the judge and told him that a stranger had approached her, and said that one of the prosecutors had been a member of the Ku Klux Klan. She had answered that they were not trying the prosecutor, to which the stranger replied: "Are you a Jewish girl?" Another juror, a man who had taken the woman to the judge, said that he had heard some such talk among the jurors. The judge told them both to put it out of their minds and keep their counsel; later the man told the other prosecutor that the same rumor was circulating among the jury. This was in turn reported to the judge, who called the defendants and the prosecutors to a conference, and after hearing them, denied the defendants' motion for a mistrial. The rumor, taken by itself, if it hurt anybody, was more likely to hurt the prosecution than the defendants. They do not rely upon that, however: they argue that the insistence of the male juror a second time upon bringing the information to the prosecution showed that he was committed to a conviction, and no longer had an open mind. There was not the slightest reason to suppose that he was actuated by any such motive: perhaps he was officious, but many fair-minded people are that. It would have been absurd to take the motion seriously.

Finally, the defendants complain that in their speeches to the jury the prosecution exceeded reasonable bounds. The speeches of the defense were not taken down, and we cannot therefore know how far the challenged matter was merely responsive. Vause v. United States, 2 Cir., 53 F.2d 346, 354. As the prosecutors' speeches read, they do not seem to us to have overstepped their proper limits: to tell a jury in such a case that the public is watching the result, and that if they acquit, it will be a license to others to sell securities by false representations, is fair comment. It does not urge them not to be guided by the evidence, but admonishes them to consider the gravity of their decision. Prosecutors are indeed held to more continence than defendants, but there is nothing improper in their bringing to the jury's mind the consequences to the public

of an error; it is a fair counterweight to the personal appeals of the defense, so often made with all the accoutrements of tragedy. These speeches seem to us comparatively pallid in comparison to much that courts have approved.

Judgments affirmed.