## UNITED STATES v. MORTIMER.
### No. 190.

Circuit Court of Appeals, Second Circuit.
March 17, 1941.

Walter Brower and Bernard Tompkins, Sp. Assts. to Atty. Gen., for the United States.

Theodore Kiendl, of New York City (John T. Dooling and Earl E. Keyes, both of New York City, on the brief), for appellant.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

In 1935, appellant, George T. Mortimer, was indicted with five other persons, all officers of the New York Title and Mortgage Company in 1930, '31, and '32, for using the mails to defraud and for conspiring to do so. 18 U.S.C.A. §§ 338, 88. Of this group, Cyril H. Burdett, a vice-president of the company, died during the course of the trial; Joseph C. Shields, a vice-president, was acquitted; Harry H. Kahler, chairman of the board of directors, pleaded guilty; and H. P. Williams, chairman of the executive committee, Mortimer, the president, and H. F. Breitwiescr, a vice-president, were convicted on various substantive counts, while Williams and Mortimer were also convicted on the conspiracy count. Mortimer alone appeals from the conviction and the resulting judgment of imprisonment and fine.

The fraudulent acts and the conspiracy charged against these defendants were allegedly in pursuance of the New York Title and Mortgage Company's business, which was the lending of money on the security of metropolitan mortgages and the sale to the public of mortgages or of certificates of participation therein. In substance, the fraud consisted of selling the company's guaranteed mortgages and participation certificates on the basis of the high degree of security they had, at a time —during 1931-32—when the value of much of the security was inadequate to protect the loans, and the condition of the guaranteeing company was precarious. On March 14, 1933, the New York Superintendent of Insurance prohibited further sale of securities; on August 4, 1933, he took over the company for rehabilitation. The exact amount of the losses sustained by the company's clients does not appear. Admittedly they were very substantial.

The evidence clearly shows that an offense was committed. The company was active in its sales campaign during 1931-32 to the point of aggressiveness. It resorted to newspaper advertising, circular letters, and pamphlets, and employed a large staff of agents, none of whom, however, seem to have been acquainted with the condition of the company or the actual value of the mortgages. The one characteristic of the company's mortgages and certificates which it consistently and almost exclusively sought to call to the attention of prospective investors was their inherent and superlative security. It emphasized that "every dollar is secured by a first lien on improved real estate worth more than one and one-half times the amount of the mortgage." It promised that this margin of collateral and "the bond of a responsible borrower protect you against the possibility of loss," and that its own guarantee of them insured "safety of principal and an unfailing income." In an outburst of unrestrained confidence, it characterized its investments as "safe for great insurance companies," "legal investments," "depression-proof," "like certified checks," "Secure as the Bedrock of New York."

But these assurances were quite false. The amounts at which many of the properties were appraised were shown to have been deduced from, rather than determinative of, the amounts of the mortgages; and the appraisals were far above any reasonable evaluation of the properties at that

time. Several of the so-called "responsible borrowers" were judgment-proof employees of the company itself. At least as early as February, 1932, in appellant's own words, the condition of the company-guarantor was "alarming." Far from being depression-proof, the security of these investments probably became questionable about the summer of 1931, as a result of the precipitous decline of real property values in June. It seems that during the fall of 1931 the company invoked a clause allowing it to delay payments against several holders of matured certificates, and that unpaid calls, foreclosures, and defaults on interest payments and taxes progressively increased from that time. Obviously properties on which there had been defaults could not serve as collateral adequate for legal investments. The steady decline in the amount of the company's cash and other liquid assets had then begun, and it was increasing the amount of its non-liquid assets pledged for loans. All this was made abundantly clear by a series of treasurer's reports during April and May, 1932; but the customary practices continued as long as appellant was president, indeed until his successor, about a month after his resignation on November 30, 1932, ordered that the sale of certificates cease.

■ Appellant's defense, in substance, was that, however reprehensible may have been the conduct of the company's affairs, none of these matters were brought home to him individually. He claimed ignorance of the appraisal practices, the use of dummy bondsmen, the nature of the company's advertising, the imminence of its insolvency, and the issuance of certificates under mortgages on properties subject to arrears of taxes and interest and on foreclosed properties. During all this period, however, appellant was in active charge of the company's policies along with Kahler and Williams. He conferred regularly with them on all matters of general importance, and received frequent reports on all aspects of the company's business. These facts alone would be sufficient to justify an inference that he was not unaware of practices so customary as those demonstrated, or conditions of such general significance. United States v. Dilliard, 2 Cir., 101 F.2d 829, 835, certiorari denied 306 U.S. 635, 59 S.Ct. 484, 83 L.Ed. 1036; United States v. Bob, 2 Cir., 106 F.2d 37, 40, 125 A.L.R. 502, certiorari denied 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493. But there is much direct evidence of his active participation, so much, indeed, that the question he raises as to its sufficiency seems hardly sincere. He himself professes to have been in personal control of the management of foreclosed property, against which certificates were issued, and for which the dummy bondsmen were largely used. There was evidence that he was on the appraisal committee, and that he passed on much of the advertising, of which a large part appeared in his name. The treasurer's confidential reports of May-June, 1932, drawn up particularly for him, Williams, and Kahler, could not have failed to bring to his attention the tax arrearages and the critical condition of the company. We conclude that appellant's guilt was clearly established.

■ Most of the other grounds of the appeal do not require extended consideration. One was that appellant had been required to answer a question directed at his failure, on invitation, to appear before the grand jury. The objection seems to be that he was thereby deprived of his privilege against self-incrimination. That privilege, however, in respect of anything connected with the offense charged here, was clearly waived by his offer to testify at the trial. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054; United States v. Buckner, 2 Cir., 108 F.2d 921, certiorari denied 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016; Tomlinson v. United States, 68 App.D.C. 106, 93 F.2d 652, 114 A.L.R. 1315, certiorari denied 303 U.S. 646, 58 S.Ct. 645, 82 L.Ed. 1107; Commonwealth v. Smith, 163 Mass. 411, 40 N.E. 189. There being no other reason for exclusion, the question was properly allowed, since it was relevant to the issue of appellant's credibility. Raffel v. United States, supra.

■ Objection was made to certain allegedly inflammatory language in the summation by the United States attorneys. Some of the summation, which referred to purchasers of certificates named in the indictment who had died before they could be called as witnesses, was said to insinuate that they had committed suicide as a result of their losses; but a reading of these passages reveals no foundation for this charge. None of the other passages seem to have been objectionable; certainly they do not justify reversal. United States v. Buckner, supra, 108 F.2d at page 929; United States v. Dilliard, supra, 101 F.2d at page 837; United States v. Socony-Vac-

uum Oil Co., 310 U.S. 150, 237, 60 S.Ct. 811, 84 L.Ed. 1129.

The most serious objection, technically, is that made to the admission in evidence of a number of charts purporting to show defaults in the payment of taxes on a high proportion of the mortgaged properties. These charts had been prepared by the prosecution witness Karcher, an experienced public accountant, assisted by several aides, of whom only one, in addition to Karcher, took the stand. One more seems to have been in the court room; the others were outside the district and at a distance at the time of the trial. The reliability of the charts is not questioned, and several of the defendants and their witnesses checked the figures and found no disparity, rather, indeed, that Karcher had been very fair. An exhibit by an expert for the defense—made up in the way appellant here criticizes—tallies remarkably with Karcher's charts, particularly when allowance is made for the fact that it does not include the second half of the 1932 taxes. It did show that the ratio of all arrears in taxes and interest to the principal amount in the important mortgage series was less than 3 per cent; a matter not brought out by Karcher. But the number of mortgages in arrears, not the total amount of the arrears, was the "danger signal." United States v. Dilliard, supra, 101 F.2d at page 832. Appellant challenges the admission of the charts on two grounds: that they were prepared from tax records not themselves in evidence, and that all those who participated in their preparation did not testify. Since the facts could have been brought out in any event by lengthy trial processes, and since appellant had the benefit of all the aid in rebuttal which his expert could suggest, we might well deny reversal merely for the lack of a showing of substantial injury. United States v. Kelley, 2 Cir., 105 F.2d 912, 917. But we think the charts were admissible.

The voluminous material summarized by the charts was itself extracted from a great number of tax record books of each of the metropolitan counties. Not only would the production of those books have been a practical impossibility, but the procurement of either certified copies or title company abstracts, as authorized by New York Civil Practice Act, §§ 382, 385, of those records, involving hundreds of parcels of land, would have been most expensive, as well as disruptive of the activities of the record offices and burdensome upon the court. Furthermore, the records themselves, in official custody, were equally open to inspection by the defense. In such circumstances, secondary evidence is admissible to prove their contents, as it would be if they were outside the jurisdiction of the court or lost. Burton v. Driggs, 20 Wall. 125, 87 U.S. 125, 136, 22 L.Ed. 299; Stephens v. United States, 9 Cir., 41 F.2d 440, certiorari denied 282 U.S. 880, 51 S.Ct. 84, 75 L.Ed. 777; see Galbreath v. United States, 6 Cir., 257 F. 648, 658; 4 Wigmore on Evidence, 3d Ed. 1940, §§ 1218, 1230.

But appellant argues most strenuously that all of Karcher's aides should have been called. That this is a purely formal objection is shown by the testimony obtained from the one aide who took the stand. He testified that he and another assistant had made up the record cards, which he produced, covering their abstracts from the tax records on over a thousand parcels. Thus the amenities were formally satisfied, but certainly appellant was not the gainer, if, indeed, anyone was, by such routine testimony. Obviously the aides saw only part of the picture. The authenticity of the whole must depend upon Karcher's supervision and direction. His should therefore be the testimony upon which its evidential value rests. Karcher himself testified that he supervised the entire job, giving full time from November, 1934, until June or July, 1935, and then for various periods until the fall of 1937. First the arrears as shown by the company's own files were computed; then, since these were not complete, he directed the check from the tax records according to a plan which called for arrears of at least 30 days' duration, and resolved all doubtful questions in favor of defendants. We have seen that the results demonstrated the fairness of his method.

There are numerous cases holding admissible on the testimony of a supervising agent statements compiled from voluminous records according to a method at once practicable and offering reasonable guaranty of accuracy, even though the supervisor had not examined each record himself. Northern Pac. R. Co. v. Keyes, C.C.N.D., 91 F. 47, 58; E. I. Du Pont de Nemours & Co. v. Tomlinson, 4 Cir., 296 F. 634, 640, certiorari denied N. B. Josey Guano Co. v. E. I. Du Pont de Nemours & Co., 273 U.S. 696, 47 S.Ct. 93, 71 L.Ed. 845; The Spica, 2 Cir., 289 F. 436, 442;

United States v. Becker, 2 Cir., 62 F.2d 1007, 1010; United States v. Cotter, 2 Cir., 60 F.2d 689, 693, certiorari denied 287 U. S. 666, 53 S.Ct. 291, 77 L.Ed. 575; Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 2 Cir., 18 F.2d 934; State v. Findley, 101 Mo. 217, 14 S.W. 185; Bourquin v. Missouri Pac. R. Co., 88 Kan. 183, 127 P. 770. Obviously this rule loses none of its force by reason of the passage of the recent statute, 28 U.S.C.A. § 695, under which writings and records made in the regular course of any business, where it is the regular course of such business to make them, are admissible in any court of the United States. See Ulm v. Moore-McCormack Lines, Inc., 2 Cir., 115 F.2d 492; Id., 2 Cir., 117 F.2d 222. The only possible reason for asserting that these authorities are not quite controlling is that these cannot be business entries, since they were made in preparing evidence for this trial; and, indeed, the case of Morton Butler Timber Co. v. United States, 6 Cir., 91 F.2d 884, 889, does say, as a ground for affirming a ruling made below, that entries "made apparently for exclusive use as evidence in this case" were therefore not in the regular course of business. This ruling is, however, condemned by Wigmore as "unsound; the men who made them were acting in the regular course of their employment." 5 Wigmore on Evidence, 3d Ed. 1940, § 1530, pp. 384, 385. And it is opposed to the leading case of Northern Pac. R. Co. v. Keyes, supra, where the tables in question were prepared for the particular case.

On principle we cannot see why an accountant's aides whose job it is to take off material from the public records so that their chief may construct his tables and charts accurately are not acting in the regular course of business. In United States v. Cotter, supra, 60 F.2d at page 693, L. Hand, J., says: "In the case of a bank, the accuracy of whose records is essential to the very life of its business, and where, because of the multitude of transactions, the entrants can do no more than describe the system and say that they followed it, it is not necessary to go further than prove that the ledgers were kept by a system likely to insure accuracy, and that they appear to be regular on their face; the other side must discredit them." Likewise, accuracy is the life of an accountant's business, but the multitude of records cannot be checked by any one person alone. ·And here the system followed was not merely likely to insure accuracy, but apparently did so,

since the other side, far from discrediting the records, actually supported them. The trend in the courts is unmistakably to follow the methods of ordinary business in assuming the validity, until discredited, of records daily accepted in commercial routine. Even the case of Great Northern R. Co. v. Washington, 300 U.S. 154, 168, 57 S.Ct. 397, 81 L.Ed. 573, relied on by appellant, though it only held unacceptable accounts prepared by the state auditor from unofficial and apparently unclear time slips —not official records—was not immune from criticism; for it brought forth a vigorous dissent by Mr. Justice Cardozo, speaking for himself, the Chief Justice, and Justices Brandeis and Stone, and was severely condemned by Wigmore, ibid.

Several other grounds of appeal were pressed, but we find them without substance. The requests to charge were properly refused; the court's charge was careful and discriminating; and appellant's conviction came as the outcome of a fair and just trial.

Affirmed.