**Vey McLAIN, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 36896.**

Court of Criminal Appeals of Texas.

June 27, 1964.

Rehearing Denied Oct. 28, 1964.

408

Arthur L. Lapham, J. M. Fly, Victoria, for appellant.

Wiley L. Cheatham, Dist. Atty., Cuero, Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for murder; the punishment, life.

The appellant was charged with killing Cornelia (Connie) Williams on or about April 18, 1963, by shooting her with a gun. Connie Williams was the wife of Curtis (Bennie) Williams, with whom the appellant had been intimate during their visits of two or three times a week for a period of about ten months before the death of Connie Williams.

At approximately 3:50 p.m., April 18, 1963, a badly burned body was found in a rural garbage pit in Victoria County. From the jewelry removed from the body and the dental work which Connie Williams' dentist compared with his dental charts, the body was identified as that of Connie Williams by the members of her family and the dentist.

An autopsy performed on the body of the deceased showed that her death was caused by a bullet which passed through the aorta and into the heart. Three bullets were removed from the body of the deceased; and an analysis of deceased's blood revealed that the blood type was Group O, R.H. Positive.

Appellant strenuously challenges the sufficiency of the evidence to support the conviction.

The testimony of Bennie Williams reveals that he and his wife, the deceased, had lived three miles from El Toro on the Vanderbilt road west of Edna and about fifteen miles from Victoria. Bennie Williams met the appellant at a tavern in Victoria in July 1962, and since that time they had gone together two or three times a week until April 18, and had been intimate almost every time. They talked about living together approximately four months after they first met. They had several quarrels which arose out of Bennie Williams' dancing with other women, but they "made up" after each quarrel. The appellant asked Bennie Williams if he could get a divorce, and when he told her he could not, she said if he ever left his wife she would live with him. On Saturday night, April 13, they had another dispute about his dancing with another woman, and he told appellant he did not want to see her (appellant) anymore. However, on April 17, Wednesday night, Bennie Williams returned to appellant's trailer house. During this visit, when he told her he was going to spend more time with his wife and family, the appellant asked him if anything ever happened to his wife if he would come back to her, and Bennie Williams said "yes, I guess so." Then he told her he "would probably see her Saturday night" and left to go to his home.

The appellant was married but during her acquaintance with Bennie Williams she and her husband were separated, and on February 7, 1963, they were divorced. They had two sons, one of whom lived with his father and the other, Harold McLain, Jr., lived with his mother (the appellant) in a trailer house in Victoria. Appellant told Harold Jr. that Bennie Williams was not married.

Before April 18, the appellant did not know and had never seen Bennie Williams' wife, nor did the latter know nor had she ever seen the appellant, and she did not know that her husband, Bennie Williams, was acquainted with or was dating the appellant.

Harold McLain, Jr. testified that Bennie Williams had been coming to Victoria to see his mother, the appellant, two or three times a week for about ten months; that on April 17, the appellant came home in a black Buick, with red trim, which she had borrowed from Pete Wrigge to use while her car was being repaired, and she parked the Buick on the other side of the trailer park from her trailer house; that the next morning, April 18, she awakened him about 7:30 or 8, left in the Buick, and returned about 8:30 or 9 a. m.

At this point, the state pleaded surprise as to Harold's testimony about appellant's movements and statements and the time they occurred, during the morning of April 18, and proof was offered in support of its position. To contradict Harold's testimony the state introduced a portion of his written statement, which recites in part as follows:

"On Thursday, April 18, 1963, my mother woke me up at 6:30 a. m. She said she was leaving and wouldn't be back until about 11:30 a. m. She didn't say where she was going. She left in the Buick because I could tell by the loud noise that it made. The Dodge was parked by my window. I got up at about 8:30 and went to Fergusion's Drug Store for breakfast. I then went back home and my mother came home about 10 a. m. and parked the Buick in the same place that it was parked before. She changed clothes and took a shower. About 10:30 a. m. she drove the Buick back to Wriggie's and I followed in the Dodge. She then drove the Dodge to work and I drove the Dodge back home. I stayed around home most of the day. Some girl that worked with my mother brought her home about 9 p. m. She then told me that if anyone asked me anything that I should tell them that the Buick wasn't moved and that she didn't use it, and that she had been home all morning Thursday morning, and that Rose had taken her to work at 10:30 a. m. Thursday Morning, April 18, 1963. I have

read this statement and it is true and correct."

About 7:20 a. m., on April 18, a neighbor who was on the same rural telephone line with the deceased—which line provided distinguishing rings for the two telephones—heard, at several intervals, the one ring indicated for the Williams' (deceased's) residence, as distinguished from the two successive rings for her own telephone.

Another neighbor, whose residence was nearby that of the deceased, testified that deceased appeared excited about 7:30 a. m., April 18; that she did not see the deceased leave, but when she went to her home at 12 noon the deceased was not there, and her housework was undone, which was, for her, unusual.

The witness Kutac testified that while traveling toward El Toro about 8 a. m., April 18, she saw a 1957 black Buick with a red stripe parked off the pavement on the right hand side of the road a short distance from and facing the store at El Toro; that the occupant of the automobile had the left hand and face on the steering wheel, looking away from the road; that the person was wearing a red scarf with a black binding but she could not identify the person. She further testified that about ten days later she saw and examined a 1957 black Buick with a red stripe at the Sheriff's Office in Victoria and that it was the same car she had previously seen parked on the El Toro road.

The operator of a grocery store at El Toro testified that the deceased lived about two miles from the store; that shortly before or after 8 a. m., April 18, the deceased drove her car into the store's driveway and remained seated in the car. Five minutes later the automobile was still there but the deceased was gone although the store manager never saw her leave. Deceased's automobile remained parked at the store until her relatives came looking for her about 3 p. m. that day.

When the witness Wilburn, a rice farmer, stopped at the store in El Toro about 8:10

a. m., April 18, he saw deceased's car parked at the store but no one was in it. After leaving the store and passing the garbage pit, he saw ahead of him a woman getting out of a car on the passenger side and as he came to the car, which was a black Buick with a red stripe, he observed that the woman was in a hurry and had an unpleasant expression on her face. This occurred between 8:40 and 9 a. m., April 18, about 1.4 miles from the garbage pit. As Wilburn was passing the car he almost stopped because of the driver opening her car door and starting to get out. They were facing each other. While testifying, Wilburn identified the appellant as the driver of the car. Later, Wilburn saw a car at the Sheriff's Office, and testified that in his opinion it was the car he had seen on the road near the garbage pit. From the pictures of the deceased, Wilburn identified the passenger as the deceased.

Wilburn testified that while about a mile from the garbage pit at 10 a. m., he could see smoke coming from the direction of the garbage pit; that it was black smoke which would go up in big blasts, then diminish, and momentarily go back up; and that he saw smoke coming from the garbage pit when he came back along the road near the pit about 11:40 a. m., April 18.

Frank Sala, a licensed mortician, of 35 years experience, testified that he removed the deceased's body from the garbage pit. Although he made no extensive investigation at the scene or in the area of the body, he expressed the opinion that the body was not burned in the garbage pit.

Two days after the body of the deceased was discovered, a two-gallon can with the odor of some inflammable fluid coming from a vent hole therein and dark red stains on the bottom, was found on the road near the garbage pit. A chemist testified that from an examination of the can he found on the bottom some blood spots which were of human origin, but he was unable to determine the blood type. On cross-examination Harold McLain testified that the can looked like one they had at the trailer house.

On April 17, about 5:30 p. m., the appellant borrowed a 1957 black Buick from S. J. Wrigge, in Victoria, saying she wanted to go to see a doctor in Edna the next day, and that she was going to have her car repaired. Appellant returned the Buick at 10 or 10:30 a. m., April 18. Wrigge stated that on the previous day, before appellant borrowed the Buick, he had washed and cleaned the inside of the automobile and that he did not see any oil or blood on the floor board or upholstery, and that he never saw an oil can under the seat on April 17. On April 24, Wrigge saw an oil can protruding from under the front seat of the 1957 black Buick, and also saw oil on the floor mat. The oil can appeared to have been opened with a beer can opener. After Wrigge heard that appellant had been questioned about deceased's death, he examined the Buick more closely, on April 25, and on the passenger side he could see red stains in the oil soaked floor carpet and a blood spot on the padded dashboard.

It was stipulated that the appellant had never made any appointment with or been in the office of any doctor, dentist, or medical man or woman in Edna.

Sheriff Marshall testified that when he examined the Buick, about April 29, he found several spots of blood on the dashboard and glove compartment of the automobile and the floor mat was almost covered with oil.

A chemical test thereof showed the contents of the oil can found under the front seat of the Buick to be similar to the oil on the floor mat.

The chemical test made thereof revealed that the scrapings off the dashboard and portions of the floor mat taken from the Buick on April 29, were of human blood, type O, R.H. Positive.

Chemist Beardsley, of the Texas Department of Public Safety, made microscopic studies of hair found on the right front floor board of the Buick, and compared such hair with hair removed from the head of deceased's body and he expressed the opinion that the hairs were identical in all respects and could have come from the same person or body.

On December 28, 1962, a merchant in Palacious sold to Harold McLain, Sr., the husband of the appellant, a .22 RG10 Revolver, which was foreign made, and also sold him a box of cartridges.

Fred Rymer, supervisor of the firearms section of the Texas Department of Public Safety, with 23 years of experience in that section, was delivered three bullets, identified as those removed by a physician and pathologist from the body of the deceaased, to determine from what type of firearm they were discharged. After making tests he expressed the opinion that these bullets were fired from a .22 RG10 Revolver which was made in Germany.

In October or November, 1962, the appellant while discussing large purses with a friend, stated that, among other things, she carried a gun in her purse.

Testifying in her own behalf, the appellant, age 34, stated that she was married to Harold McLain, Sr., age 36; that they had two sons, one of whom Harold McLain, age 15, lived with her, and that the other son was living with his father; that they were divorced February 7, 1963, and remarried June 21, 1963. She testified that after she had separated from her husband she began going with Bennie Williams in July, 1962, and they had two or three dates a week. She stated that, on April 17, she borrowed a Buick from S. J. Wrigge to use while having her car repaired, but she denied telling him she wanted to drive the Buick to Edna. She further testified: During a date with Bennie Williams on the night of April 13, he never said anything to her about ending their relationship but said he would return April 17, which he did, and left about 11 p. m. The next morning, April 18, she arose at 7 a. m., and woke her son about 7:30 or 8 a. m. She then went to a cafe, arriving between 8 and 8:30 a. m., and after drinking two cups of coffee, re-

turned home. Her son had already been to the garage to see about repairing the car. After getting some clothes she drove the Buick to the house of the person who did her laundry; and then she stopped at a service station, and next went to a grocery store. While there she telephoned Rose Lockwood about 9:30 a. m. not to come by the trailer for her. Then she went home, dressed, and returned the Buick to Wrigge, and her son took her on to the place she worked, arriving about 10:30 a. m. About 6:30 p. m. that evening, Bennie Williams came by where she was working. She asked if he had come to see her and he said "not tonight," that he was looking for his wife who he thought was shopping.

The appellant denied being at El Toro on April 18, or that she had ever been at the garbage pit. She admitted owning a two-gallon oil can but said it was a Texaco can instead of the Humble can which was introduced in evidence; that she had never seen or had a foreign made pistol; that she never poured oil on the Buick and did not see any oil or blood on it when she used it. The appellant denied shooting or burning the body of the deceased, and denied asking Bennie Williams if he would return to her if anything happened to his wife.

Harold McLain, Sr., testified that on December 28, 1962, he bought a .22 GR10 Revolver, which he carried in his suit case; that the appellant had never seen it, and that he sold it in January, 1963, to a laborer on a pipeline, and had not seen him again.

Rose Lockwood testified that she worked with the appellant at a store on April 17; that appellant asked her for a ride to work April 18 when their hours were to be from 11 a. m. to 9 p. m.; that about 9:30 a. m., April 18, appellant telephoned from a grocery store saying she could use her car, and she saw appellant at the store shortly after 10 a. m. where they worked all day. On cross-examination the witness stated that appellant told her she had no alibi; that appellant said she was out driving on the morning of April 18, but denied that ap-

pellant told her she drove on the Goliad Highway or near Refugio on April 18. Two of state's counsel testified that Rose Lockwood stated to them that appellant had told her she drove out on the Goliad Highway and near Refugio on April 18.

The appellant called four witnesses who testified that her general reputation for truth and veracity and for being a peaceful and law-abiding citizen was good.

The court charged the jury on the law as applicable to circumstantial evidence, and also charged on alibi.

The facts and circumstances surrounding the deceased's death, when considered as a whole, are sufficient to warrant the jury's conclusion that the appellant killed the deceased.

Appellant contends that the trial court erred in permitting the state to impeach its witness Harold McLain, Jr.

In presenting its case, the state called Harold McLain, Jr. as an adverse witness, to which the appellant objected on the ground that when the state called him it should be as a state's witness. After a conference at the bench, the court instructed the jury to disregard the term "adverse" applied to the witness when he was called by the district attorney and not to consider it for any purpose during their deliberations. Next, the record shows he was called as a witness by the state.

The movements and statements of the appellant and the time they occurred, on the morning of April 18, were deemed vital facts in the case.

Harold McLain testified that the appellant left home about 7:30 or 8 a. m., April 18, and returned about 8:30 or 9 a. m., the same morning. After this testimony, the state pleaded surprise and sought to contradict it by proof that the witness had made a written statement to the county attorney, which he re-affirmed before the grand jury except as to some matters not relating to the occurrence on the morning of April 18. The

statement shows that the appellant left the house about 6:30 a. m., on April 18, and returned about 10 a. m., the same morning; that she cautioned Harold to say, if asked, that she had not used the Buick and had been home all morning, and that Rose took her to work.

After the plea of surprise had been developed in the absence of the jury, the following occurred in their presence:

STATE: "If it please the Court, the State would offer that portion of the statement that we have just read." (Shown elsewhere in opinion.)

APPELLANT: "We object to it."

COURT: "The objection will be overruled."

APPELLANT: "I am objecting to just introducing a part of the statement. If any parr of the statement is introduced, it should all be introduced."

COURT: "You have the right to offer the rest of it."

APPELLANT: "Well, we will offer the rest of it. It is the State's evidence."

STATE: "Are you offering the rest of the—

APPELLANT: "Yeah, I'll do it when my turn comes up."

The objection made to the introduction in evidence of the portion of the statement did not point out the grounds of the objection. Therefore, it is deemed insufficient to preserve for review the admissibility of the statement. 5 Tex.Jur.2d 68, Sec. 41; Press v. State, 168 Tex.Cr.R. 1, 322 S.W.2d 525; Erwin v. State, 171 Tex. Cr.R. 323, 350 S.W.2d 199. Further, the general objection makes a review of the complaint that he had been deprived of a statement of facts in preparing the formal bill of exception unnecessary.

Appellant insists that the trial court erred in refusing her request, made while the witness Wilburn was testifying, that she be given a copy of the statement made by the witness Wilburn for the purpose of cross-examination. The request was refused by the court, and to such refusal the appellant stated: "Note my exception."

After the trial court declined the request for a copy of the statement, the appellant at that time took no further action, and made no effort to have the statement produced for the record. From the record there is no showing that the statement was used or exhibited by anyone during the trial. Therefore no error is presented. Moreno v. State, 170 Tex.Cr.R. 410, 341 S.W.2d 455. However, the appellant complained of the refusal of her request for a copy of Wilburn's statement in his amended motion for a new trial. On the hearing Wilburn's statement was produced and is contained in the statement of facts on motion for new trial. The only discrediting fact pointed out by the appellant in her brief is that Wilburn testified that he gave the statement latter part of April or the first of May, whereas the statement is dated June 8, 1963. This variance alone would not warrant a reversal.

The other contentions presented have been considered and they do not show error.

The judgment is affirmed.

Opinion approved by the Court.

## ON APPELLANT'S MOTION FOR REHEARING

MORRISON, Judge.

Appellant's extremely able counsel on appeal has taken this Court to task for our original opinion, and though he does not attack or challenge our summary of the evidence set forth in the original opinion, he does express his belief that we accepted blindly the jury's verdict and failed to exer-

cise our judicial function of passing upon the sufficiency of the evidence.

Another Judge has carefully examined this 900 page record, and we remain convinced that the State has made its case. With persistence the prosecutor carefully combed the community for every available clue which would shed light upon the guilt of the person who shot and then later burned the body of this timid country housewife. Counsel admits the evidence established that his client had the motive or reason for wanting deceased disposed of and that she was seen with the deceased some seven hours before her body was discovered and that she told her son not to tell anyone that she had used the Buick automobile that morning. He fails to mention the testimony of the witness Wilburn, who placed appellant with deceased near where her body was found and who saw smoke rising in intermittent puffs from the garbage pit within an hour thereafter. This telling bit of evidence, when taken with the myriad other testimony, is amply sufficient to support this conviction.

■ Appellant again complains that the court erred in permitting the State to plead surprise when its witness Harold McLain, Jr. did not testify in accordance with his prior written statement. The statement was taken on the day after his mother's arrest and she was later released on bail. Harold was brought before the Grand Jury and reaffirmed the correctness of his statement (with the exception of an immaterial point), and the prosecutor very wisely, under the circumstances, refrained from talking to the witness again until he was placed on the stand. This is a perfect case authorizing the plea of surprise.

■ Appellant again urges that he should have been permitted to examine the statement of the witness Wilburn and the prosecutor's notes. They will be treated separately. Wilburn's statement was introduced by appellant at the hearing on the motion for new trial. It was unsealed and available to counsel at that time and when he approved the statement of facts on motion for new trial. If any discrepancy between the statement and Wilburn's testimony at the trial existed, appellant had ample opportunity long before this case reached this Court to point out on original submission wherein he had been injured by the refusal of the court to permit him to inspect such statement at the trial. Such being the case, appellant has not brought himself within the rule set forth in Gaskin v. State, 172 Tex.Cr. 7, 353 S.W.2d 467, and Witt v. State, 170 Tex.Cr.R. 387, 341 S.W.2d 457.

■ Appellant's last complaint is to the refusal of the court to permit him to inspect the District Attorney's notes used by him in interrogating the witness Wilburn. Such notes were sent to us sealed and have been examined. The record does not disclose that Wilburn had ever seen the District Attorney's notes and the holding in United States v. Dilliard, 2 Cir., 101 F.2d 829, 835, cert. den. 306 U.S. 635, 59 S.Ct. 484, 83 L.Ed. 1036, would preclude appellant's access to the prosecutor's notes.

Remaining convinced that we properly disposed of this cause originally, appellant's motion for rehearing is overruled.

ON MOTION FOR REHEARING

WOODLEY, Presiding Judge (concurring).

The evidence set out in our original opinion, viewed in the light most favorable to the state, is deemed sufficient to sustain the findings of the jury and the appeal was properly decided on original submission.

For the reasons stated, I concur in the overruling of appellant's motion for rehearing.