In the Matter of EDMUND J. DONEGAN, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner. In the Matter of MAX N. KOVEN, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, April 22, 1943.

*Einar Chrystie* for petitioner.

*E. J. Dimock* of counsel (*Hawkins, Delafield & Longfellow,* attorneys), for respondent Edmund J. Donegan.

*Jacob L. Holtzmann* for respondent Max N. Koven.

*Per Curiam.* In 1935 the respondents were indicted by a Federal grand jury, together with State Title and Mortgage Company, a New York corporation, John A. Dilliard, its former president, and George B. Skiffington, a vice-president, for using the mails to defraud and also for conspiring to use the mails to defraud. After a trial, lasting many weeks, a jury in the United States District Court for the Southern District of New York acquitted all the defendants on each of the counts charging the use of the mails to defraud but found the president, Dilliard, and the respondents guilty on the single count which charged a conspiracy to commit the other offenses of which they were acquitted. Although we recognize, of course, that

a conspiracy may exist apart from the crime to which it relates, it is difficult to understand how, under the circumstances of the present case, such a view could consistently have been entertained by the jury, for if the defendants planned the commission of the unlawful acts which were established at the trial, they were necessarily guilty of using the mails to defraud. This strange result is, we think, explained by the testimony of two of the jurors to the effect that the verdict represented a concession to a small minority of the jury and was rendered upon the assurance that a verdict finding the respondents guilty only of conspiracy would have negligible consequences to the defendants. In saying this, we have no intention to impugn the settled rule that testimony of jurors may not be considered to disturb the effect of judgments where they are conclusive. In the present case the judgments of conviction have been held not to be conclusive in this proceeding. We are, therefore, justified in attributing to them only such force as the verdicts of the jury on which they depend seem, under all the circumstances, to require.

The judgments of conviction were affirmed by the Circuit Court of Appeals, Second Circuit, in a carefully considered opinion (*United States* v. *Dilliard,* 101 F. 2d 829) holding, in effect, that the guilt of the defendants presented an issue of fact for the jury. Upon those judgments, orders were entered by this court on March 17, 1939, disbarring the respondents. (*Matter of Donegan,* 256 App. Div. 535.) These orders were reversed by the Court of Appeals (282 N. Y. 285, 282 N. Y. 646), which said (282 N. Y. 285, 293): '' The proceeding is remitted to the Appellate Division which may proceed under subdivision 2 of section 88 of the Judiciary Law, authorizing the Appellate Division to govern the conduct of attorneys. The judgment of conviction will constitute at least *prima facie* evidence of guilt of the crime charged. (Cf. *State* v. *O'Leary,* 207 Wis. 297; annotated, 81 A. L. R. p. 1193.) We do not need to go further.''

Thereafter upon motion of the petitioner the matter was sent by this court to Hon. RICHARD P. LYDON, official referee, to take testimony and report to this court. Against the respondent Donegan there was charged misconduct arising out of acts, many of which, it is very clear, involved no element of wrongdoing on the part of anyone. Other acts were charged which, it is equally clear, were unlawful and would require expulsion from the Bar of an attorney who had participated therein.

Against the respondent Koven the only act of alleged misconduct consisted of a single appraisal of an annex to the Hotel Victoria. This appraisal, claimed to be excessive, was made after the structure was completed and increased a previous appraisal estimating the value of the land and structure. After an exhaustive inquiry into their conduct, the referee has reported that the respondents are innocent of the offenses of which they were convicted and that the proceeding should be dismissed. He said: "On the evidence before me it is established that both respondents had nothing whatever to do with the handling of mortgages after appraisal, their placement in any particular series, or of their sale. * * *

"Here we have a large corporation with numerous departments, and if there were irregularities in departments with which the respondents had no connection and of which they had no knowledge, it is going too far afield to charge them with responsibility because they were officers and, therefore, were presumed to know."

In conclusion the referee said: "I am convinced that the respondents have completely answered the charges made against them and have overcome the presumption existing because of the concession that the judgment is *prima facie* evidence of guilt of the offense charged. Furthermore, even if the petitioner's contention that the respondents had the burden of proof could be upheld, the evidence compels a finding that the charges have not been sustained."

We are now asked to say that the findings of the experienced referee must be overruled on account of the verdict of the jury to the contrary in the United States District Court. We are unwilling so to hold. The Court of Appeals which remitted the matter to this court for further proceedings must have intended that there should be, not mere formal inquiry necessarily productive of the same result as the proceedings in the United States District Court, but a comprehensive investigation of the fitness of the respondents to remain members of the Bar in which the judgment of conviction would be *prima facie,* but not conclusive, evidence.

Reference is made in the dissenting opinion to testimony of the respondents, that use was made of obsolete appraisals in placing mortgages and that on some occasions after foreclosure a new mortgage, which included accumulations of interest and foreclosure costs, was used as collateral. These reprehensible practices of the title company to which the respondents testified from information subsequently acquired were not shown

to have been participated in or even known to the respondent Donegan at the time of the transactions nor is it contended that Koven was implicated therein. We do not pause, therefore, to denounce these and other practices in which, as the referee has found upon sufficient evidence, neither respondent was implicated.

We also note a statement in the dissenting opinion, not sustained or suggested by any evidence in the record, that " the opinion of the Circuit Court of Appeals discusses an attempt which was made to tamper with this jury while the trial was in progress." It is perhaps unnecessary to say that it would be most unusual and also most unjust for this court to consider statements not sustained by any evidence and, therefore, not susceptible of refutation.

Bearing in mind the admonition of the Court of Appeals to regard the judgments of conviction only as *prima facie* evidence of professional misconduct, we have carefully examined the testimony before the referee and have concluded that his report is fully sustained by the record, which in many important particulars differs from the record which was under consideration by the Circuit Court of Appeals. It is impossible within the scope of this opinion to refer to the many complicated transactions which furnish the basis of these charges. It is sufficient to say that those acts in which the respondents participated have not been shown to be discreditable and that in those acts which may be described as discreditable the respondents are not shown to have participated. We have read the record with a realization that attorneys should be held to a high standard of integrity. They should not, however, be subjected to the punishment of disbarment except upon evidence, as distinguished from suspicion not sustained by proof.

The proceeding against each of the respondents should be dismissed.

MARTIN, P. J. (dissenting). The respondents were convicted of the crime of conspiracy to use the mails to defraud, after a trial in the United States District Court for the Southern District of New York. Their conviction was unanimously affirmed by the United States Circuit Court of Appeals, Second Circuit (*United States* v. *Dilliard*, 101 F. 2d 829). The United States Supreme Court denied applications for writs of certiorari (306 U. S. 635). Applications to the President of the United States for pardons were also denied.

On March 17, 1939, orders were entered disbarring the respondents, in accordance with this court's interpretation of section 477 and section 88, subdivision 3, of the Judiciary Law (256 App. Div. 535). However, the Court of Appeals, two judges dissenting, was of the opinion that strict construction of section 88, subdivision 3, and section 477 of the Judiciary Law required that the term " felony " include only those Federal felonies which are also felonies under the laws of this State, and excludes such Federal felonies as are cognizable by our laws as a misdemeanor or not at all. In remitting the proceedings to this court, the Court of Appeals said (282 N. Y. 285, 293): " The proceeding is remitted to the Appellate Division which may proceed under subdivision 2 of section 88 of the Judiciary Law, authorizing the Appellate Division to govern the conduct of attorneys. The judgment of conviction will constitute at least *prima facie* evidence of guilt of the crime charged. (Cf. *State v. O'Leary*, 207 Wis. 297; annotated, 81 A. L. R. p. 1193.) We do not need to go further."

Thereafter the Association of the Bar of the City of New York moved that such further action be taken as the decision of the Court of Appeals required. The matter was sent to an official referee to take testimony and report to this court with his opinion thereon. Subsequently the petitions were amended so as to make a copy of the record of the proceedings in the Federal court a part of the petitions herein, which petitions were also amended to allege that the crime for which the respondents had been convicted involved moral turpitude.

The prosecution in the Federal court grew out of the failure of the State Title and Mortgage Company, of which the respondent Donegan was vice-president and later treasurer, and the respondent Koven was a vice-president. The company was described by the Circuit Court of Appeals as follows (p. 831): " * * * The company was organized in the year 1927 for the purpose of selling guaranteed mortgages; sometimes it sold these outright; sometimes it sold ' participation certificates ' in a single mortgage, which it held in trust for certificate holders; sometimes it set up as security a pool of mortgages, which it either assigned to a trustee, or itself held in trust. On June 1, 1929, it was merged with two other companies doing a similar business, and took over their assets and obligations; its capital was then $8,300,000. It continued in business until March 3d, 1933, when it suspended operation, and it was taken over by the state insurance department in the summer of that year. * * *."

For the purpose of selling its mortgages and certificates, the

company engaged in a selling campaign which took the form of extensive advertising and distribution to prospective customers of a form letter, pamphlets, folders and blotters. The Circuit Court of Appeals said (p. 834) that the company issued repeated statements absolutely at variance with the facts, and, "in particular, the mortgages were by no means uniformly first liens upon improved property, and in many cases the appraisals of the mortgaged property could have been found to have been deliberately made too high. It is, moreover, impossible to justify the greater part of the collateral behind Series ' E,' during the second quarter of 1932, and the ' Carlton Notes ' were always improper; the jury might have found that the appraisal of the Victoria Annex had been made only as a cover to get hold of the existing pool of saleable mortgages, and to put in its place one which it had found unsaleable and knew to be of doubtful security. Again, the practice of executing a new mortgage by a dummy upon foreclosure of the old, was permissible only if a new and disinterested appraisal was made; something *prima facie* most unlikely at the old figure, for the very fact that the first mortgage had been foreclosed was some indication that the loan as it stood had proved too heavy. This was not true when the foreclosure was of a junior mortgage, but even that did not abate the necessity of a new appraisal. The evidence seems to us to leave little doubt that, as so often happens in similar cases, the company, being more and more pressed financially, continued to repeat what though once true, had become false and was then known to be false. That is enough to constitute a ' scheme to defraud ' within § 338 of Title 18, U. S. Code   *   *   *."

The pamphlet entitled " A Simple Investment That Is Safe " contained a false statement that prompt payment of principal and interest was guaranteed by a fund under the jurisdiction of the Insurance Department of the State of New York. In *People* v. *Dilliard* (252 App. Div. 125) it was held that a corporation organized prior to the passage in 1929 of former section 173 of the Insurance Law was not obliged to maintain the guaranty fund required by that section. That decision, however, does not render less false the representation first made by the company in 1930 that the fund was maintained. This pamphlet was distributed to the knowledge of the respondent Donegan and without any objection on his part, notwithstanding his belief that the 1929 statute was applicable to his company. Donegan was the author also of the two other pamphlets mentioned in the Circuit Court of Appeals, entitled, " Your Home and Its Mortgage " and

"Panics and Depressions," and was also the editor of the company's monthly publication entitled, "Fiduciary Law Chronicle," which carried advertisements that the mortgages sold by the company were all first liens, never exceeding sixty-six and two-thirds per cent of a conservative valuation, and that they were exceptional investments for trust funds. The Circuit Court of Appeals pointed out that Donegan was in charge of the selling campaign which he had declared at one time to be intended to secure a market for "frozen" or "partially frozen" mortgages.

In 1929 the company made a loan of $1,500,000 on the premises to be erected as an annex to the Hotel Victoria at Fifty-first street and Seventh avenue. This was an unusual loan, as only one other loan made by the company exceeded it in amount. When the mortgage became payable, the owners were unable to secure a permanent loan for the required amount and the company agreed to extend the mortgage for one year. In June, 1930, the respondent Koven appraised the property at $2,500,000. He testified that the appraisal was a routine matter, and he had no direct recollection of having signed it. It appears that in the Federal court he testified that he was specifically asked whether the property would stand an appraisal of $2,500,000. Koven approved the proposed extension on June 28, 1930. His formal report now shows that he had written thereon: "Cruikshank & Co., $1,925,000." On June 18, 1930, the Cruikshank company had appraised the property at $1,925,000, and a copy of the appraisal had been sent to the company. In July, 1931, the Victoria Hotel mortgage, which had been reduced to $1,473,000, was deposited in Series C. The deposit agreement required documents showing that the property had been appraised by the company's appraiser as being worth one and two-thirds the amount of the mortgage. Koven made a certificate that he valued the property at $2,500,000. When the Victoria mortgage was so deposited, saleable mortgages aggregating $1,330,000 were withdrawn from Series C. Of course, if the Cruikshank appraisal had been used, the Victoria Hotel mortgage was not suitable for substitution for these saleable mortgages. It is Koven's claim that he knew nothing of the Cruikshank appraisal when he issued his appraisal of $2,500,000, and that he first heard of it in July, 1931, when he says he made the notation above referred to. Testifying before Moreland Commissioner Alger, Koven would not say that the notation was not on his report when he signed it on June 28, 1930, but he denied that the notation was in his handwriting. In the Fed-

eral court, however, he admitted that the notation was in his handwriting. As to this situation, the Circuit Court of Appeals said (p. 836): " * * * The only other objection important enough to mention was the notation of the Cruikshank valuation of June, 1930, upon the Victoria appraisal. Delafield, who made the Cruikshank appraisal was not called, and the justification for allowing it in evidence was Koven's notation of it on the paper. The objection rests upon Koven's testimony that he wrote it down after he had made his own appraisal, and that it did not therefore charge him at the relevant time with notice of his variance from Delafield. In the first place the jury was not bound to accept his word as to the sequence of events; the document was confessedly of his own making and so was the notation, which he had already perjured himself in denying before a legislative commission. That in itself was evidence of guilt, and there was perhaps a little less likelihood that he should have added the notation later than at the time. Aside from that, whenever he made it, the notation showed that he took the appraisal seriously, and it was competent at least to show that in spite of it he did not retract what he had done."

Before the referee, respondent Koven sought to explain his testimony before the Moreland Commissioner as follows: " I might add, Mr. Holtzmann, my eyesight has been very poor for a good many years. The paper or the photostat that was shown to me, as I recall it, was blurred. I only saw it on that one occasion and never saw it before and never saw it since; and it was shown to me at some length. I don't know whether I wore my glasses or didn't wear my glasses, or just which particular glasses I had. It was rather blurred. I had no recollection, after four days of testifying, of having written it and for the moment it didn't strike me that it was my signature. The question was asked, ' Is that your handwriting?' and I said ' No.' It didn't occur to me. It didn't look like it, and as I say, the paper was not handed to me so I could examine it and look at it. It was held at arm's length by Mr. Walser and it was rather dark in that corner and the paper as I recall it was blurred, and I didn't for the moment recognize it and I didn't for the moment recall having made the memorandum, and therefore, possibly added to my failure to recognize it, and said ' No.' But there was no reason for me to deny it. It played no role there. It had no bearing of any kind.

" The Referee: You were talking about what writing there, what part of it?

" The Witness: The words, ' Cruikshank & Co., $1,925,000.' "

Upon analysis, the claim of four days of testifying is reduced to some seventy-five questions, destroying any inference of mental exhaustion, and the exhibit itself disproves the claim of blurred condition. We must agree with the Circuit Court, that Koven was not testifying frankly and honestly before the Moreland Commissioner. We also find self-contradiction with reference to the request that he appraise the property at $2,500,000.

Whenever a loan was made, the company had the property appraised. After the loan was closed, the mortgage was either deposited in a series or placed " on the shelf " to be sold or subsequently allocated to a series. When a mortgage was deposited in a series or transferred to another series, it was necessary to deposit therewith the report of the company's appraiser certifying that he had examined the mortgaged premises and that they were valued at at least fifty per cent more than the amount of the mortgage. Frequently a mortgage was undisposed of for a year or more, and when it was finally decided to place it in a series, the only appraisal used was the one made at the time the mortgage was originally placed. As to this general practice, Koven testified: " Q. So if the company had placed and accepted a mortgage in 1929 and the mortgage remained on the shelf, without assignment of any kind until 1932, and it then was decided to put that mortgage in Series C, with the Manhattan Company, the mortgage was sent to the Manhattan Company with the certificate of appraisal, dated at or about the time when the deposit in the series was made, but which appraisal in fact was a copy of the appraisal which had been made back in 1929? A. Which was a copy of the appraisal made at the last time of the appraisal, which may have been either the making of the original mortgage or the last extension."

No new examination was made of the mortgaged property to bring the appraisal down to date. Frequently the appraisals were several years old. No honest effort was made to live up to the representation that the appraisals deposited with the mortgages represented values at the time the mortgages went into the series, for the very apparent reason that such an appraisal would show a marked depreciation.

When it became necessary to foreclose mortgages, title was taken on foreclosure sale in the name of a " dummy " corporation which gave a new mortgage for the approximate cost of acquiring the property or for the next lower multiple of

$500 below that which the property cost. These mortgages frequently replaced in the series the mortgage for a lower amount which had been foreclosed. In at least one of the series the certificates sold provided that the mortgages deposited were to be mortgages made by obligors other than the company. The appraisal practice on these foreclosures was testified to by respondent Donegan as follows:

"Q. * * * I gather * * * that there were * * * many instances * * * where those new mortgages found their way back into a series and out of that series there continued to be sales or reinvestments by certificate owners and nevertheless, there was no change, no valuation or no appraisement put in with the new mortgage whatsoever. The only appraisal was the old appraisal made at the time — there were two appraisals, one made at the time that the application was originally made for the mortgage, and then the so-called foreclosure appraisal, and those were the only two appraisals in a number of instances where mortgages were foreclosed and the new mortgages executed in place thereof were put into groups? A. That I think would be true, with one qualification. When these mortgages were put in, that had been foreclosed, they were put in with an appraisal signed in typewriting, bearing the names of Mr. Koven and myself indiscriminately, no matter who made the original appraisal, and that appraisal reflected the last previous appraisal which might have been —

"Q. Might have been at the time the application for the loan was made? A. Yes, it may have been as much as two or three years prior, being the time of the last renewal."

Commenting on the procedure attendant on foreclosures, the Circuit Court of Appeals said:

"In some instances the past due interest and costs of foreclosure were added to the mortgage, though it was well known in 1932 that the general trend of realty values was downward. When these properties were remortgaged the dummy executed the bond; it had no assets and the bond was worthless, though the company had at times represented the mortgagor's bond as a substantial part of the security. Series 'E' as well as 'H' and 'K' contained some of these mortgages. * * *

"Again, the practice of executing a new mortgage by a dummy upon foreclosure of the old, was permissible only if a new and disinterested appraisal was made; something *prima facie* most unlikely at the old figure, for the very fact that the first mortgage had been foreclosed was some indication that the loan as it stood had proved too heavy."

The respondents acted as appraisers for the company and had full knowledge of and participated in the appraisal methods criticized by the court.

There are numerous other questionable features of the business of the company with which the respondents were intimately associated, but we think enough has been shown to demonstrate beyond any doubt that the respondents were, as the Circuit Court of Appeals said, conscious promoters of the scheme to defraud. The business may have been legitimate at one time, but financial pressure led to corruption. Appraisals were rigged and deliberately made too high, sales literature was issued containing statements absolutely at variance with the facts and deceitful statements were made to public officials charged with supervision of the company. This conduct was not sporadic but continued over a period of at least eighteen months and was the only way the business could be continued. The record demonstrates that these respondents were guilty of conscious falsehood for the purpose of obtaining money from trusting small investors. The court was very temperate in characterizing the respondents as conscious promoters of a scheme to defraud.

It is urged that the verdict of the jury in the Federal court was a compromise. The inconsistency of acquitting the defendants of eleven of the separate counts in the indictment and finding them guilty of the conspiracy to commit the crime for which they were acquitted is pointed out as evidencing a compromise. In addition, there was introduced the statement of the juror Young in his letter to the President in support of the applications for pardons, and the testimony of the juror Gottlieb. The statement and testimony are to the effect that jurors favoring an acquittal were persuaded to end the deadlock and find the defendants guilty on the twelfth count under the impression that that was merely a misdemeanor, and that had it been realized that the jury was finding defendants guilty of a felony, which would send them to prison for a year or more and might cause disbarment, these jurors would never have consented to the verdict. It may be of significance to note that the opinion of the Circuit Court of Appeals discusses an attempt which was made to tamper with this jury while the trial was in progress. It is well settled that testimony or affidavits of jurors are not competent to impeach their verdict, and this includes attempts to show mistake or error of the jurors in respect to the merits, or irregularity, misconduct, or that they mistook the effect of their verdict and intended something different. (*Dalrymple* v. *Williams*, 63 N. Y. 361.)

In *Payne* v. *Burke* (236 App. Div. 527, 529) it was said: " The reason for this rule is founded on sound public policy. If jurors, after they have been discharged and have mingled with the public, were permitted to discredit the verdict which they had solemnly rendered in open court, no verdict would be safe, and judgments would rest on a very uncertain foundation. The consequences of such practice would be most mischievous; it would open the door for tampering with jurors, and would make it easy for a corrupt or dissatisfied juror to destroy the very verdict to which he had deliberately given his assent under the sanction of an oath. Jurors would constantly be importuned by dissatisfied litigants, and pressed for affidavits upon which their verdict might be assailed. Every trial lawyer knows full well how easy it would be to find some complacent juror who would yield to such appeal. If such practice were countenanced, few, if any, verdicts would survive, and there would be no end to litigation. (*McDonald* v. *Pless*, 238 U. S. 264; *Tyler* v. *Stevens*, 4 N. H. 116; *Blodgett* v. *Park*, 76 id. 435; *Tenny* v. *Evans*, 13 id. 462; *Keith* v. *State*, 7 Okla. Cr. 156.) "

On the rendition of the verdict in the Federal court, the jury was polled and assented to the verdict. A contrary verdict would have been against the overwhelming evidence. The trial court refused to set it aside, and the pardoning power was evidently unimpressed by the statements of the importuning jurors.

Claim has been made that errors were committed by the Circuit Court of Appeals in its opinion affirming the judgment of conviction. The court did acknowledge one error and corrected it by inserting a new page in its opinion. The claim of serious error, however, related to the request of Mr. Donegan to have the following sentence concerning him stricken from the opinion: " He directed that plainly false answers should be given as to the relations of the company to its affiliate or subsidiary." A complete answer to this contention is the following letter signed by the three judges of the Circuit Court of Appeals and sent to Mr. Donegan:

" Answering your letter of the 8th, we write to say that in regard to the passage which you wish deleted from the opinion, it seems to us best to leave it as it is in view of the record. However, we wish to say — and this you may use as you wish — that if the actual circumstances of its utterance were as you say, we do not think that it should be counted as deliberately false. We do not feel free, however, to correct a statement which on the face of the record was correct. The sentence we mean is as follows: ' He directed that plainly false answers should

be given as to the relations of the company to its affiliate or subsidiary.'

" The impression left upon the reader by the other passage which you criticise was misleading and the opinion will be changed by substituting the enclosed page in place of the present page 5.

Truly yours,

(Signed)   LEARNED HAND<br>"   THOMAS W. SWAN<br>"   AUGUSTUS N. HAND "

The referee reported that the respondents had nothing to do with the handling of the mortgages after appraisal, their placement in any particular series or their sale; that if there were irregularities in departments, respondents should not be charged with responsibility because they were officers and presumed to know. In other words, the referee would have us believe that it was the hirelings who were the guilty ones and not these gentlemen. The Circuit Court of Appeals rejected this line of reasoning pointing out that these respondents were chief executives and in daily charge and quoted with approval from the observation of the trial judge addressed to the jury as follows: " You cannot put a department into a sealed room * * * men who are generally conversant with a business of this kind, ordinarily know some of the things that generally take place." In effect, the referee says that the judges of the Circuit Court of Appeals must have been mistaken when they characterized these respondents as conscious promoters of a scheme to defraud. Our reading of the record convinces us that the characterization given by the Circuit Court of Appeals is more than justified. The evil complained of is the fruit of the respondents' planting. The referee alone absolves respondents of wrongdoing. We are not persuaded that the Federal judge, the Federal jury, the Circuit Court of Appeals and the President of the United States are all wrong in their appraisal of these respondents.

It is now said that the acts in which the respondents participated have not been shown to be discreditable. Is it honorable to publish false statements knowing them to be false, with the intention of deceiving the public? The answer to this question is found in the able opinion of the Circuit Court of Appeals concurred in by the three judges of that court.

The object of this proceeding is not to punish the respondents but is to determine their fitness to continue as members of the Bar. The record as developed before the referee establishes that the respondents were actively interested in having their

company dispose of securities of questionable value and, to promote the sale thereof, respondents consciously and unhesitatingly misrepresented the facts. There was here much more than the customary exaggeration of an over-enthusiastic seller. The record establishes a deliberate scheme to defraud the public and, as participants in this scheme, the respondents were guilty of moral turpitude. It has been demonstrated that in an ordinary business transaction they are capable of unfair dealing. Measured even by the "morals of the market place" they are unworthy. The lack of personal honesty compels the withdrawal of the stamp of approval once given which would enable respondents to hold themselves forth as worthy of the confidence which is inherent in the relation of attorney and client and which must be based on sound ethics. Were the respondents applicants for admission to the Bar, we would be obliged on the record before us to deny them the privilege. In *Matter of Rouss* (221 N. Y. 81, 84) it was said: "Membership in the bar is a privilege burdened with conditions A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards (*Selling* v. *Radford,* 243 U. S. 46; *Matter of Durant,* 80 Conn. 140, 147). Whenever the condition is broken, the privilege is lost. To refuse admission to an unworthy applicant is not to punish him for past offenses. The examination into character, like the examination into learning, is merely a test of fitness. To strike the unworthy lawyer from the roll is not to add to the pains and penalties of crime. The examination into character is renewed; and the test of fitness is no longer satisfied. For these reasons courts have repeatedly said that disbarment is not punishment (*Ex parte Wall,* 107 U. S. 265; *Matter of Randall,* 11 Allen, 473, 480; *Matter of Randel,* 158 N. Y. 216; *Boston Bar Assn.* v. *Casey,* 211 Mass. 187, 192; *Matter of Durant, supra*). ' The question is,' said Lord Mansfield, ' whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion ' (*Ex parte Brounsall,* Cowp. 829). ' It is not,' he continued, ' by way of punishment; but the court, on such cases, exercise their discretion whether a man whom they have formerly admitted, is a proper person to be continued on the roll or not.' This ruling was announced after consultation with all the judges, ' as it is for the dignity of the profession that a solemn opinion should be given.' On that high plane the jurisdiction was thus early placed, and in that high spirit it has been exercised. Even pardon will not elude it. Pardon

blots out the offense, and all its penalties, forfeitures and sentences; but the power to disbar remains (*Matter of* ———,
*an Attorney,* 86 N. Y. 563)."

The respondents have been convicted of fraud by a jury. It is established that they have been guilty of deceit and many corrupt business practices. In addition, the Circuit Court of Appeals, in condemning them, has pointed out that one of them was guilty of perjury.

The respondents should not be permitted to continue as members of the Bar and should be disbarred.

GLENNON, UNTERMYER and DORE, JJ., concur in *Per Curiam* opinion; MARTIN, P. J., dissents and votes for disbarment, in which TOWNLEY, J., concurs.

Both proceedings dismissed.