In the Matter of FRANCES KAHN, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, January 13, 1972.

*John G. Bonomi* of counsel (*Patrick J. Moynihan* with him on the brief), for petitioner.

*Frances Kahn* (*Armende Lesser* with her on the brief), respondent in person.

*Per Curiam.* In this disciplinary proceeding, respondent has moved to confirm the report of the Referee as to the charges against her and to vacate the outstanding order of suspension of respondent, thus in effect reinstating her to the Bar. Petitioner has cross-moved to disaffirm those portions of the report wherein Charges I and III against respondent are found not to be sustained, to confirm that portion which finds Charge II to be sustained, to adjudge respondent guilty of professional misconduct, and to impose appropriate discipline.

## History and Prior Proceedings

Respondent was admitted to practice in the First Judicial Department on March 31, 1952. She was convicted, after trial, in the United States District Court, Southern District of New York, in 1966 of conspiracy to obstruct justice, in violation of several sections of title 18 of the United States Code. The conviction was affirmed in the same year (366 F. 2d 259) and she then commenced to serve a sentence of two years in the Federal Reformatory for Women. On July 20, 1967, on petitioner's application, respondent was suspended from practice until further order (28 A D 2d 846); the order was served by mail at the prison wherein she was confined, and, after her release in 1968, an unsuccessful attempt was made to ascertain her whereabouts so that a disciplinary hearing might be held. After an undefended hearing, she was disbarred (32 A D 2d 360), but she thereafter appeared and indicated a desire to defend, presenting reasons for earlier failure to appear which, accepted by the court, resulted in vacatur of the disbarment order and re-referral to the Referee, the suspension remaining in effect. The Referee has completed the hearing and submitted his supplemental report to which the motion and cross motion are directed.

## The Charges and the Answer

### I

Charge I alleged respondent's conviction on March 30, 1966 of the crime of conspiracy with Israel Schawartzberg and Vincent Pacelli, to influence and bribe a witness, Charles Hedges, in connection with testimony Hedges was to give before a Federal Grand Jury respecting Pacelli, to obstruct and impede the due

administration of justice thereby, and to suborn perjury, in violation of sections 1503 and 1622 of title 18 of the United States Code, and her consequent sentence to two years in prison. The answer admitted these facts, but asserted innocence of the crime charged.

## II

Charge II alleged respondent's failure to uphold the honor and dignity of the profession by hiring, as legal secretary and law clerk, Israel Schawartzberg, theretofore convicted twice of felony and also of several misdemeanors, and by a court-martial, and who had been released from prison shortly before the hiring, and that she had permitted him to participate actively in the conduct of her legal practice and in the operation of her law office. The answer admitted these facts, except that she denied Schawartzberg's active participation in her practice, claiming that his performance was limited to isolated instances.

## III

Charge III alleged respondent's failure to guard the Bar against admission to the profession of a candidate, Schawartzberg, unfit and unqualified because of deficiency in moral character and education, in that she filed a certificate of commencement of clerkship in her law office to qualify him for admission to the Bar. The facts were admitted in the answer, but respondent asserted that, during his employment with her prior to filing of the certificate, Schawartzberg had been completely rehabilitated.

### *The Referee's Report*

In sum, the report exculpates respondent outright as to Charges I and III and, though Charge II was found to have been established, it was minimized as professional misconduct.

Charge I was sustained as to the fact of conviction in the District Court, but, " to the extent that it alleges that respondent's conduct was ' in violation of Section 90 of the Judiciary Law ', it was * * * not established." Charge II was found to have been established, but only to the extent that it involved the interviewing of witnesses in the manner practiced by respondent and her employee. Charge III was found not established. We bear in mind that the Referee saw and heard those witnesses who appeared before him (*Matter of Michaelson,* 283 App. Div. 281, 282), and that his opinion should have — and we have given it — serious consideration (*Matter of Gondelman,* 258 App. Div. 1085, 1086). However, we disaffirm the report as to Charges I and III for the reasons hereinafter set forth.

I

The indictment in the United States District Court charged respondent with having conspired with her clerk, Schawartzberg, and with Pacelli, to interfere with, obstruct and impede testimony to be given by Charles Hedges before a Grand Jury concerning Pacelli's activities in connection with narcotics. She was also charged with the related substantive count, of which she was acquitted. Hedges was in jail on unrelated matters, where respondent visited him several times as his attorney. Hedges and his wife testified that respondent made several efforts to bribe Hedges and to persuade him not to harm Pacelli by his testimony and, particularly, to move dates of activities participated in by Pacelli earlier in time so as to afford the latter the protection of the Statute of Limitations. Respondent testified that there had never been such a participation or arrangement by her, thus setting up an issue of credibility as between her and the Hedges couple, resolved by the jury against her, and she was convicted of conspiracy. Only Pacelli, of the three, was convicted of the substantive count as well as of conspiracy. Prior to trial, she had moved for a severance, fearing that she would be unable to call Schawartzberg as her witness to exculpate her. She had also moved (251 F. Supp. 702) for suppression of certain tapes made by Charles Hedges in his cell — he had been "wired" by the Federal authorities, and she, suspecting the possibility of eavesdropping, had loudly played a small radio on each visit. The tapes, though she was given access to them, were not used at the trial. Both motions were denied, and were, as intermediate motions, considered and the rulings not disturbed on appeal.

The Referee permitted respondent broad latitude in presenting her case, basing his determination so to do, as the report sets forth at length, upon his reading of *Matter of Donegan* (256 App. Div. 535, revd. and remanded 282 N. Y. 285 and 646; on remand 265 App. Div. 774, affd. without opn. 294 N. Y. 704) and *Matter of Keogh* (25 A D 2d 499, mod. 17 N Y 2d 479). The thrust of the holding, made over petitioner's objection, was that respondent, not being subject to automatic disbarment because of her conviction for conspiracy to obstruct justice and suborn perjury, a Federal felony, amounting in counterpart to a misdemeanor under New York law (Penal Law, §§ 105.00, 105.05; former Penal Law, § 580), was entitled at the hearing to the equivalent of a complete new trial of the Federal case before the Referee as part of a comprehensive investigation of fitness to remain a member of the Bar. So reads *Matter of Donegan* (265 App. Div. 774, 777), and *Matter of Keogh* (17 N Y 2d 479,

481) appears to enlarge the possible scope of that inquiry to whatever the hearing officer, subject to the Appellate Division's review, deems relevant. There is no need here to reach the question as to whether *Keogh* (p. 481) limits the extent of the expanded hearing, as claimed by petitioner before the Referee, to new evidence not available on the trial; to strike out evidence repetitious of that adduced at the trial would not change the result which we have reached here.

From the trial to the hearing there was a change in the cast of characters: the main witness common to both was the respondent herself. Disbelieved by the jury at her trial, she was entirely credited by the Referee. The transcript of testimony of both the Hedges, believed by the jury at the trial, was read by the Referee, and characterized by him as completely unworthy of belief. They were not present in person at the hearing. The processes by which the Referee reversed the trial's findings as to credibility are revealed in the report; they do not accord, in our view, with reason.

Undergirding the conclusion that respondent was innocent of the crime of which convicted is the Referee's apparent acceptance of her claims of unfair treatment at the trial: the trial court's refusal of severance, and the "inconsistency" of a jury's verdict which convicted her of conspiracy while acquitting her of the substantive crime which was the goal of the conspiracy. Both of these claims were adjudicated as matters of law in the affirmance of her conviction. As to the consequence of denial of the severance which, it is claimed, deprived her of Schawartzberg's exculpatory testimony at the trial, it must be noted that the Referee himself, in considering that same testimony at the hearing, gave it no credence whatever, characterizing the witness as completely unworthy of belief. It is difficult, therefore, to see how his testimony would have helped respondent at the trial.

The basis assigned by the Referee for believing respondent was that he disbelieved Hedges, both husband and wife, whose trial testimony he only read, for several reasons. He found that Mrs. Hedges "parrotted" her husband's testimony, and this persuaded him that she had fabricated her corroboration. It does not seem that this speculation should prevail over the findings of the triers of the fact—the members of the jury—who had actually seen and heard these witnesses, and who made their findings according to the standard of "beyond a reasonable doubt," far more stringent than the standard of "fair preponderance" applicable at a disciplinary hearing (*Matter of Mogel,* 18 A D 2d 203, 204; *Matter of Phillies,* 17 A D 2d 93, 99).

The Referee reasoned further that the credibility of the Hedges couple was destroyed completely by the testimony at the hearing of James Godwin, Charles Hedges' cousin and sometime cellmate at the same jail where respondent had been a visitor. Godwin testified that Hedges had given vent to feelings of animus against respondent for her lack of success in defending him on an earlier charge. However, respondent knew of Godwin's existence and he was never called at the trial. Further, there does not appear to be anything either new or startling about the "animus" of Hedges toward respondent. After all, he had volunteered to the Federal authorities the information he had about a scheme to thwart the forthcoming indictment of Pacelli, and he had willingly permitted himself to be equipped with a device to attempt to record respondent's statements to him. Certainly, the jury could not have believed, considering these circumstances, that he entertained friendly feelings toward her! The Referee also refused to credit Hedges because of his bad record, though he accepted as his contradictor another criminal, his cousin Godwin.

"The judgment of conviction will constitute at least *prima facie* evidence of guilt of the crime charged." (*Matter of Donegan*, 282 N. Y. 285, 293, cited to the same effect in *Matter of Keogh*, 17 N Y 2d 479, 481.) In finding that the presumption of guilt has been overcome, the Referee has, it seems to us, completely ignored the force, and indeed the existence, of the presumption. And this case is completely unlike *Donegan*. There, too, it was held on appeal not to be a reason, standing alone, for mistrust of the conviction in Federal court that the jury had convicted of conspiracy while acquitting of the substantive crime. In *Donegan* it was specifically found, in addition, by the Official Referee in affirmatively declaring the respondents there innocent: "The testimony of two of the jurors clearly established that the verdict was a most unfortunate miscarriage of justice." This was stressed, in confirming, by the Appellate Division (265 App. Div. 774, 776). There was no such testimony before this Referee. Further, by the Official Referee: "Then, again, the Circuit Court of Appeals, after affirming the judgment, acknowledged a material error it made in its opinion." In addition, in *Donegan* the respondent had been exhaustively investigated by New York State authorities and a New York Grand Jury in respect of the same matters covered by the indictment, and had been completely exonerated. Not so here. In *Donegan*, the Appellate Division confirmed the Official Referee, stating (p. 778) "that his report is fully sustained by the record, which in many important particulars differs from the rec-

ord which was under consideration by the Circuit Court of Appeals." Here there is no such factor, but only a differing with the triers of the fact as to credibility. For this there was no reasonable basis.

"Nothing in this opinion should be taken to change the discretion now lodged in the Appellate Division in dealing with an attorney under subdivision 2 of section 88 [of the Judiciary Law, now section 90]." (*Matter of Donegan,* 282 N. Y. 285, 293.) Exercising that discretion, we disaffirm the finding that Charge I was not established and substitute a finding that it was established.

## II

The report has sustained the charge that an unfit person was engaged by respondent knowingly to perform legal work for her. We agree. We do not, however, adopt the speculation in which the Referee has indulged that there was no proof that respondent " knew of his [Schawartzberg's] prior illegal activities or convictions." Not alone is this admitted in the answer, but respondent's letter of October 25, 1965, to petitioner states precisely the opposite. While employment of Schawartzberg is not regarded by us as a minimal violation, analogizing as did the Referee to employment of a disbarred lawyer, it pales by comparison with respondent's guilt of Charge I, and the point need not be pursued further. The report is confirmed as to establishment of Charge II.

## III

The Referee has found that respondent filed the certificate, indicating that Schawartzberg had commenced the study of law in her office, with the purest of motives: what with changing ideas of how to rehabilitate criminals, he might some day be able to become a lawyer. Viewing his situation in the best possible light, Schawartzberg could never, from any realistic point of view, have been " rehabilitated " to the extent that he could have been seriously considered for admission to the Bar. He was a convicted felon with a " less than honorable " service discharge and he was not even eligible for a certificate of relief from the disabilities flowing from his conviction pursuant to article 23 of the Correction Law (particularly §§ 701 and 702). And this is not to mention his complete lack of basic educational requirements. When there is added to these observations the appraisal of Schawartzberg's character adopted by the Referee, painting him as " vicious and wanton," it becomes obvious that respondent's expressed faith in his rehabilitation must have been stated with tongue in cheek. Having hired

him within a few days after his release from a prison term, she could have had no information on which to base such an opinion. Indeed, quite the contrary, for, within a few months thereafter, she was frustrated by the Attorney-General, by reason of her association with Schawartzberg, in her endeavor to incorporate an organization she wished to form to help indigent defendants and criminals. She was then given chapter and verse as to Schawartzberg's background, but accepted reassurance by the latter that he had been rehabilitated ever since he had left Dannemora a few months before. The Referee has stated his agreement with respondent's view: "I felt * * * it was up to the members of the Character Committee who will be sitting at that time to make that determination and that I couldn't close the door to him [Schawartzberg]." (In this connection, rule VIII of the Court of Appeals should be read; 22 NYCRR 528.1.) However, even accepting this statement as a verity, it was still the duty of respondent not to render the task of the Committee on Character and Fitness the more difficult by filing a certificate which stated by implication that the person named therein was properly embarked upon " a period of law office study " (rule V-5; 22 NYCRR 524.5). It is not an answer to state, as did the Referee, that there is no blank space on the form for this information. The very language of canon 29 places this duty squarely on lawyers. Such a certificate is of the utmost importance as prerequisite not alone to admission to the Bar, but to admission to the Bar examination itself. (See, e.g., *Matter of Quitman,* 152 App. Div. 865, 866; *Matter of Zatulove,* 156 App. Div. 79; *Matter of Singer,* 156 App. Div. 85.) Concealment by omission or misleading of any kind in the process of admission to the Bar is an extremely serious dereliction. (See *Matter of Moshkow,* 250 App. Div. 780; *Matter of Schecht,* 242 App. Div. 495, 496.) And, of poignant significance here, this is so as to nondisclosure of a conviction, even where there has been evidence of later rehabilitation (*Matter of Kristeller,* 154 App. Div. 556, 557), or where there has been an intervening pardon (*Matter of Pritchett,* 122 App. Div. 8). Rule V-5 of the Court of Appeals (22 NYCRR 524.5) was adopted with a purpose far greater than that of merely marking the date of beginning of study of law in an office; it must be implicit in the filing of such a certificate that, to the extent of the knowledge of the certifier, the subject is of good moral character. Not to recognize this is not to respect the standards of the profession and to perpetrate a species of fraud upon those who administer the processes of admission to the Bar. To have knowledge of the deficiencies of the prospective law

student and, in disregard thereof, to file a naked certificate of commencement of clerkship, is to fail, as charged, to guard the Bar in this most important respect against an unfit candidate, and, at the very least, to make it more difficult by the gloss of the certificate to detect the candidate's unfitness. Accordingly, we find established the third charge against respondent, of having failed to guard the Bar against admission to the profession of a candidate unfit and unqualified because deficient in moral character and education (canon 29), by filing the certificate in behalf of Schawartzberg. We disaffirm the Referee's report in that particular, and substitute a finding that Charge III has been established.

## Conclusion

We have sustained all three charges against respondent, and, while they differ in degree, all are serious instances of professional misconduct, requiring imposition of discipline. One of the offenses charged against respondent is a crime involving moral turpitude, demonstrating professional unfitness (*Matter of Smith,* 216 App. Div. 173, 174). In addition, the other two offenses, failure to guard the Bar against an ineligible candidate and employment of an unauthorized person for legal services, constitute professional misconduct compounding the more serious breach. (Cf. *Matter of Connelly,* 18 A D 2d 166.)

Our dissenting colleague has stated several points, in complete acceptance of and reliance upon the Referee's report as to judgment of credibility, findings, and conclusions. He has observed that this is a Referee of " eminence  *  *  *  seniority, and wisdom ". We agree, and we add, on our own, that he possesses unimpeachable integrity and that we respect him highly. We deem it appropriate, therefore, to comment briefly on the dissent in order to indicate why we consider it to be in error as to the report. The dissent's points may be briefly summarized, to which we add our comments, as follows:

1. That this case so resembles *Donegan* (*supra*) as to require the same result. This is not so (see discussion herein of Charge I).

2. That we should not substitute our findings for those of the Referee. We should, where the occasion calls for it. The dissent finds an inappropriate parallel to administrative hearings. And it is to be remembered that the Referee himself substituted his findings for those of the trial court, and on no reasonable basis.

3. That we should not disturb the Referee's judgment as to credibility. The Referee judged respondent's credibility by comparing it with that of Hedges, whom he neither saw nor

heard, on the basis of Godwin's testimony. Godwin was of no finer quality than Hedges, and his evidence, unexplainedly not given at the District Court trial, added nothing either relevant nor previously unknown. We, too, accept *Power* v. *Falk* (15 A D 2d 216, 218) as authority for the sound rule that the case is rare where a reviewing court should cast aside a hearing officer's judgment as to credibility, but this case is the one which proves existence of the rule.

4. That respondent "is an invalid and in effect has already been disbarred since the order of her temporary suspension". The quoted statement, paraphrasing the humane expressions in the Referee's report, is probably the true key to the reason why the Referee found and concluded as he did. In understandable and, indeed, laudable sympathy, our colleague has been moved, it seems, in the same direction. But such is not the measure of our responsibility.

Our duty in these circumstances is to impose discipline, not as punishment, but to protect the public in its reliance upon the presumed integrity and responsibility of lawyers, and we are called upon to adjudicate respondent's fitness to continue in the profession (*Matter of Dougherty,* 7 A D 2d 163, 165). Respondent's misconduct is deemed sufficiently grave to interdict restoration to the profession on any terms. (See *Matter of Schner,* 5 A D 2d 599, 600.) She has been found guilty of a crime which strikes at the roots of the administration of justice, and her guilt of the violations of the canons indicates complete disrespect for and a lack of full awareness of minimum professional standards and obligations. The totality of these derelictions and the attitude displayed demonstrate the necessity in this proceeding for protection of the public by removal of respondent from the rolls of the profession.

Respondent should be disbarred.

The court expresses its appreciation for his services as assigned counsel for respondent to Armende Lesser, Esq.

MURPHY, J. (dissenting). I dissent and would grant respondent's motion to confirm the report of the Referee. The majority in its opinion has set forth the facts relative to the instant disciplinary proceeding.

Hon. George Trosk, the learned Referee who heard this matter, in his report stated:

" Thus, the question is: do we accept the testimony of the Hedges or do we accept the testimony of respondent.

" In my opinion, to state the question is to answer it.

" I venture to say that it would be difficult, if not impossible, to find anywhere in the annals of the law, another case in

which a witness was shown to be more corrupt and unworthy of belief than the evidence here demonstrated Hedges to be. And I believe that his wife, in pretended corroboration of him, merely did his bidding.

" Respondent, on the other hand, had practiced law actively here for about fifteen years before her indictment, and there is no evidence that, in all that time, there was ever the slightest blemish on her reputation, professional or otherwise. In addition, her good character and her creditable voluntary communal and professsional activities are attested by the awards she received for them, and by the testimonials of the distinguished, unimpeachable, disinterested witnesses, referred to below.

" In my opinion, the presumption flowing from respondent's conviction was destroyed by the evidence here, and I believe that the statement of Mr. Justice Lydon, as referee in the Donegan proceeding: ' The evidence compels a finding that the verdict was a most unfortunate miscarriage of justice ' is as applicable here — if not more so, considering the eighteen months respondent spent in prison as a result of it — as it was there.

" The charge, insofar as it alleges the indictment and conviction of respondent is, of course, admitted. However, to the extent that it alleges that respondent's conduct was ' in violation of Section 90 of the Judiciary Law ', it was, in my opinion, not established."

It is clear that we have every right to and should consider both the eminence, the seniority, and wisdom of a Referee where special competence is required (see *Matter of Feller* v. *Wagner*, 7 A D 2d 126).

In its opinion the majority seems to have departed from several of our well-settled rules. Generally, an appellate tribunal should not substitute its conclusions for those of the hearer of the facts. As was stated by our Court of Appeals in *Amend* v. *Hurley* (293 N. Y. 587, 594) : " The advantages of the trial court who saw and heard the witnesses should be considered and, when truth hangs upon the credibility of witnesses his decision should be given the greatest weight (*Boyd* v. *Boyd*, 252 N. Y. 422; *York Mortgage Corp.* v. *Clotar Const. Corp.*, 254 N. Y. 128; *Smith* v. *Smith*, 273 N. Y. 380)."

Whether we regard the rulings of the Referee as similar to those of a quasi-judicial determination, such as found in an administrative agency or with a jury finding in favor of a defendant, we have no warrant to set them aside merely because we differ from them.

If we regard them as similar to the findings of an administrative hearing officer, as long as the determinations have a reasonable or a rational basis, we cannot upset them. (*Matter of 125 Bar Corp.* v. *State Liq. Auth.*, 24 N Y 2d 174, as well as *Matter of Wager* v. *State Liq. Auth.*, 4 N Y 2d 465, and *Matter of Colton* v. *Berman,* 21 N Y 2d 322.) If we analogize the findings of the Referee with a jury verdict in favor of the defendant, then they should not be set aside unless it plainly appears that the evidence so preponderates the other way that they could not have been rendered on any fair interpretation of the evidence. (*Marton* v. *McCasland,* 16 A D 2d 781; *Salvitelli* v. *Janusz,* 19 A D 2d 886.) In the instant case it cannot be said that any fair interpretation of the evidence does not sustain the Referee.

Lastly, but most important, there is nothing basically unreconcilable between the record and the findings of the Referee. Thus, there is no proper basis for the exercise of a power to make new findings, such as would be permissible if we were to analogize the situation before us with that involving a nonjury action. Nor should we re-examine the assessment of the trier of fact as to the credibility of the witnesses who testified before him. (See *United States* v. *McGuire,* 381 F. 2d 306, 315.)

Although we may have the right to come to a new judgment contrary to that of the trier of the facts, such power is sparingly used. (9 Carmody-Wait, New York Practice, p. 604, § 177. *Williams Eng. & Contr. Co.* v. *City of New York,* 222 N. Y. 1; *Caldwell* v. *Nicolson,* 235 N. Y. 209.) The reluctance of appellate courts to make new findings has been noted in *Conklin* v. *State of New York* (22 A D 2d 481, 483) where the court said: " Evaluations and determinations reached *de novo* at the appellate level, amounting, in effect, to complete redeterminations of basic issues, are usually best avoided. (Cf. *Power* v. *Falk,* 15 A D 2d 218, *supra*; *Kundla* v. *Symans,* 9 A D 2d 1021.) It must be observed, however tritely, that the Trial Judge, having observed the witnesses, having viewed the premises and having gauged the proof as it was developed is better qualified to weigh the determinative facts."

Appellate courts usually shrink back, as we here should, from making new findings when the main question is credibility, since such action would arrogate the function of the Trial Judge. Particularly pertinent is the statement made by this court in *Power* v. *Falk* (15 A D 2d 216, 218) wherein we noted: " While we would have the power to make findings, this is not a proper case for the exercise of that power, as much would depend on

the credibility of the witnesses and the visible indications of authoritative recollection.''

It is apparent that the Referee who heard these proceedings, who observed the witnesses, had strong feelings with respect to the credibility of the witnesses. I do not believe that we should disregard his judgment in the matter.

It appears that respondent has spent most of her life helping handicapped children as a member of the New York Philanthropic League Order of True Sisters. In 1959 she received an honorary award for noteworthy humanitarian work. In addition, she has represented numerous indigents and had been appointed as counsel by many Supreme Court Justices in first degree murder cases. Respondent is an invalid and in effect has already been disbarred since the order of her temporary suspension, dated July 10, 1969.

Under all the circumstances surrounding this case it is my view that a more fitting punishment would be a suspension for a period of three years. In *Matter of Thaler* (30 A D 2d 166) comparable punishment was ordered for a lawyer who participated in bribery of public officials. By this punishment the canons will not only have been vindicated, but she will have been spared the supreme disgrace of disbarment, which in the light of the Referee's report I find unwarranted.

CAPOZZOLI, J. P., MARKEWICH, STEUER and EAGER, JJ., concur in *Per Curiam* opinion; MURPHY, J., dissents in opinion.

Respondent disbarred as an attorney and counselor at law in the State of New York effective February 14, 1972.